200 N.J. Super. 28 (1985)
490 A.2d 327
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY SCIOSCIA AND HOME AND INDUSTRIAL DISPOSAL SERVICE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 1985.
Decided March 20, 1985.
*31 Before Judges MICHELS, PETRELLA and BAIME.
Joseph J. Benedict argued the cause for appellant (Benedict and Altman, attorneys; Joseph J. Benedict, on the brief).
Gerard C. Sims, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Steven Kaflowitz, of counsel; Gerard C. Sims and Steven Kaflowitz, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Defendants Anthony Scioscia and Home and Industrial Disposal Service, along with 55 other individuals and entities, were charged in a single count indictment with violating the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., by knowingly engaging in a combination and conspiracy in restraint of trade. *32 N.J.S.A. 56:9-3. More specifically, the indictment alleged that the defendants and others agreed not to compete among themselves with respect to public and private solid waste disposal contracts in nine northern New Jersey counties. Following a protracted jury trial, defendants were convicted. Also found guilty were co-defendants Louis Spiegel and Inter County Refuse Service, Inc.[1] The jury was unable to reach a verdict with respect to the remaining co-defendants, Browning-Ferris Industries, ISA in New Jersey, Inc., John M. Gentempo and Louis Mongelli. The court sentenced defendant Scioscia to an 18 month custodial term. The sentence was suspended and defendant was placed on probation for two years.[2] As a special condition of probation, Scioscia was ordered to serve 100 hours of community service. Additionally, the trial judge imposed a fine of $5,000 and directed that defendant pay a penalty of $25 to the Violent Crimes Compensation Board. Similarly, defendant Home and Industrial was fined $5,000 and was ordered to pay a $25 penalty pursuant to N.J.S.A. 2C:43-3.1.
The charges and resulting convictions emanated out of defendants' participation in an unlawful customer allocation agreement. As part of the alleged conspiracy, members acquired exclusive "property rights" which permitted them to provide garbage collection service to different locations without competition. The agreement was designed to stifle "predatory" *33 bidding practices which had been long dominant in the industry. The conspiracy was implemented through the formation of the New Jersey Trade Waste Association (TWA). In order to prevent competition between collectors, the TWA provided an "amnesty period" after which the "property rights" to service specific areas were assigned. Such rights were conferred upon the first Association member to serve a given location. Although competition in the industry was largely illusory, the appearance of legality was maintained through the utilization of collusive and complementary bids. Stated somewhat differently, the collectors and haulers would submit bids in accordance with a prearranged plan to insure that the Association member having the property rights to a particular area would ultimately be awarded the contract. Disputes concerning the allocation of customers were resolved by "grievance hearings" which were conducted by the officers of the TWA. Under this practice, the disputing parties would present their arguments to the committee which would then render a binding decision. Compliance with the committee's decisions was mandatory. Often, the losing party was compelled to invent an excuse in order to be relieved of its contractual obligations.
At trial, the State's principal witness against defendants was Jack Bubenick. He testified that he was the owner of Bubenick Brothers Carting and that he had been involved in the garbage collection business for approximately 20 years. Bubenick was a member of the TWA from November 1976 until February 1977, and was aware that the ownership of property rights provided the exclusive authority to service a particular area. In November 1976, Bubenick attended a grievance hearing concerning solid waste disposal contracts which were about to be offered for public bidding by the Township of Westfield. In 1975 and 1976, Bubenick's company had been awarded the contract by submitting the lowest bid. Prior to that time, the contract had been shared by Custom Disposal Service and defendant Home and Industrial. Defendant Scioscia was the principal of the latter firm.
*34 The grievance hearing was conducted at the office of Central Jersey Disposal, which was owned by Michael and Anthony DiNardi. Both DiNardis were members of the TWA. When Bubenick arrived, Michael DiNardi, "Red" Grillo and Anthony Scaffidi were present. Scioscia, accompanied by Jack Argento, appeared shortly thereafter and was immediately ushered into another room. Bubenick was advised that the purpose of the meeting was to resolve a grievance that had been lodged by defendants Scioscia and Home and Industrial. Apparently, Scioscia, who was not a member of the TWA, wished to regain his share of the Westfield contract. At the time of the grievance hearing, Bubenick was preparing to submit a bid on the Westfield contract for the following year. His position was that Bubenick Brothers Carting possessed property rights to the location. The hearing lasted several hours and became somewhat acrimonious. Throughout the meeting, Bubenick and Scioscia remained in separate rooms. Grillo and Scaffidi shuttled between the two in an attempt to mediate the dispute.
At the conclusion of the meeting, Bubenick was informed that his company had lost the grievance. As a result, the witness was directed to submit a complementary bid to insure that Home and Industrial would be awarded the contract. Although the record is somewhat unclear, it appears that defendant, Bubenick, Grillo, Argento, DiNardi and Scaffidi subsequently discussed the arrangements for the proposed bidding. It was agreed that Home and Industrial would submit a bid of two dollars a yard and that Bubenick would offer a higher amount. According to Bubenick, the parties agreed upon these figures following many hours of negotiations during which he, Scioscia, Argento, Scaffidi, Grillo and DiNardi were present.
Bubenick was unhappy with the committee's decision and decided to subvert the plan. Bubenick Brothers Carting and Home and Industrial were the only parties to submit bids for the Westfield contract. According to the witness, he deliberately submitted his bid after the 10 o'clock deadline knowing that it would be rejected and that Westfield would not award the *35 contract based solely upon Home and Industrial's offer. Subsequently, the township rejected all bids. Ultimately, Bubenick submitted a lower bid than that agreed upon and was awarded the contract.
Defendants advance numerous arguments on appeal. They first contend that a solid waste collector constitutes a public utility and is thus exempt from the monopoly and restraint of trade prohibitions contained in the New Jersey Antitrust Act. They further claim that the evidence presented to the grand jury was insufficient to support the return of an indictment. It is also argued that the trial judge abused his discretion in denying defendants' motion for a severance. Defendants assert that their voluntary absence from portions of the trial requires reversal of their convictions. Lastly, they claim that the jury's verdict was against the weight of the evidence. Our thorough review of the record convinces us that all of defendants' contentions are devoid of merit. We affirm.

I
We first address questions pertaining to the statutory exemption set forth in N.J.S.A. 56:9-5b(3). That section provides in pertinent part as follows:
No provisions of this act shall be construed to make illegal ... [t]he activities of any public utility, as defined in [N.J.S.A.] 48:2-13 to the extent that such activities are subject to the jurisdiction of the Board of Public Utility Commissioners, the Department of Transportation, the Federal Power Commission, the Federal Communications Commission, the Federal Department of Transportation or the Interstate Commerce Commission....
This provision is supplemented by N.J.S.A. 48:2-13 which includes solid waste collectors in the definition of "public utility." It is thus argued that Home and Industrial constitutes a public utility exempt from the proscriptions of the Antitrust Act.
We disagree. We do not doubt that Home and Industrial is a public utility subject to the jurisdiction of the BPU. Nor do we dispute the fact that the BPU is vested with broad statutory authority to regulate the solid waste collection industry. It has been said that N.J.S.A. 48:2-13 confers upon the BPU a general *36 jurisdiction over utilities "as far as [can] be done by legislative act." State v. New York Central Rd. Co., 52 N.J. Super. 206, 208 (Ch.Div. 1958). See also Atlantic Coast Electric Ry. Co. v. Pub. Utility Board, 92 N.J.L. 168, 175 (E. & A. 1918), app. dism. 254 U.S. 660, 41 S.Ct. 10, 65 L.Ed. 462 (1920); In re Central Rd. Co., 30 N.J. Super. 520, 523 (App.Div. 1954). In placing solid waste collection entities under the public utility law, our Legislature recognized that the industry is a matter of "grave concern to all citizens" and "is an activity thoroughly affected with the public interest." N.J.S.A. 48:13A-2. The BPU was granted broad authority to regulate solid waste collection rates, N.J.S.A. 48:13A-4, to designate their franchise areas, N.J.S.A. 48:13A-5, and to issue certificates of public convenience and necessity, a condition precedent to engaging in the business. N.J.S.A. 48:13A-6. "The [BPU's] control over public utility solid waste enterprises, N.J.S.A. 48:2-13 et seq. and N.J.S.A. 48:3-1 et seq., complemented by provisions of the Solid Waste Utility Control Act of 1970, N.J.S.A. 48:13A-1 et seq., includes complete jurisdiction over the initial rates or charges made by solid waste collectors to municipalities in the same fashion that it has over other public utilities." In re Application of Saddle River, 71 N.J. 14, 35 (1976) (Schreiber, J., concurring). Clearly, the Legislature has chosen supervision by the BPU as one of its principal regulatory mechanisms. Id. at 21.
This much conceded, it is a far different thing to suggest that this pervasive regulatory scheme serves to exempt all activities of solid waste collectors from the purview of the Antitrust Act. Our Supreme Court had occasion to consider a somewhat related question in In re Application of Saddle River, supra. There, the Court confronted the issue of whether the "public utility" exception to the competitive bidding requirements of the Local Public Contracts Law, N.J.S.A. 40A:11-5(1)(f), included solid waste collection agreements. In construing the exemption, the Court recognized that the "Legislature departed to some extent from the traditional concept of a public utility" when it amended N.J.S.A. 48:2-13 and conferred upon the BPU *37 the authority to regulate solid waste collectors and disposers. In re Application of Saddle River, supra at 21. The Court observed that generally a public utility is characterized "as an enterprise enjoying monopoly power by virtue of a governmentally granted franchise, and as a result requiring regulation in the public interest." Ibid. In contrast, "[t]he structure of the solid waste collection industry is not monolithic, like that of the more conventional utilities  railroads, electric, gas and telephone companies." Id. at 22. The Court described the industry as "composed of numerous scavengers, serving overlapping territories and utilizing landfill sites run by various governmental and private operators." Ibid. Significantly, the Court identified the compelling public policy of fostering competition within the industry as being the primary legislative motivation in placing solid waste entities within the regulatory jurisdiction of the BPU. In that regard, the Court noted:
From testimony adduced at the many legislative investigations of the industry, it is apparent that the system as it existed prior to the passage of the Solid Waste Utility Control Act not only tended to inefficiency in the form of wasteful fragmentation and conflicting licensing requirements, but also was fraught with the potential for abuse in the form of favoritism, rigged bids, official corruption, and the infiltration of organized crime. To remedy this situation, while at the same time giving due attention to the public health and environmental aspects of the industry, most of the recommendations to the Legislature stressed the importance of encouraging competition within a regulated framework. [Ibid.; footnote omitted].
In view of this strong public policy favoring competitive bidding, the Court rejected the argument that solid waste agreements were exempt from the Local Public Contracts Law. Id. at 24. The Court noted that the BPU was statutorily authorized to grant franchises, but had not yet exercised that power. "If at some later time, the [BPU] elects to exercise its authority to the full extent conferred by the Legislature and designates franchise areas for solid waste utilities, competitive bidding will no longer serve any purpose and the exception to the bidding statute will come into play." Id. at 32. The Court, thus, held that "contracts negotiated with solid waste disposal and collection *38 utilities do not at present fall under the exception of N.J.S.A. 40A:11-5(1)(f)." Ibid.
We are satisfied that these considerations apply with equal force with respect to the exemption provided by N.J.S.A. 56:9-5(b)(3). We note in that regard that the Solid Waste Utility Control Act and our antitrust statutes were jointly recommended as parts of a coordinated effort to cope with the dirty realities of organized crime. See Frederick B. Lacey, United States Attorney for the District of New Jersey, Recommendations to the 1970 Session of the Legislature Concerning Legislation Which Might Be Enacted to Curb the Power and Influence of Organized Crime in New Jersey (Jan. 20, 1970). See also New Jersey State Commission of Investigation, A Report Relating to the Garbage Industry of New Jersey (Oct. 7, 1969). It would totally eviscerate and subvert the legislative plan were we to construe the exemption as precluding prosecution of criminal restraints of commerce neither mandated nor permitted by the BPU.
In our view, the legislative history strongly militates against such a construction. We note that our primary obligation in interpreting the statute is to seek to effectuate the legislative intent. State v. Fearick, 69 N.J. 32, 37 (1976); Monmouth County v. Wissell, 68 N.J. 35, 43-44 (1975); State v. Carlos, 187 N.J. Super. 406, 414 (App.Div. 1982). When all is said and done, "the matter of statutory construction ... will not justly turn on literalisms, technisms or the so-called rules of interpretation...." Jersey City Chapt. Prop. Owner's, etc., Ass'n v. City Council, 55 N.J. 86, 100 (1969). See generally Bomse v. Mullin, 183 N.J. Super. 431 (App.Div. 1982). Rather, we must construe the statute in a commonsense fashion consonant with the legislative design. N.J. Builders, Owners and Managers Ass'n v. Blair, 60 N.J. 30, 338-339 (1972); Jersey City Chapt. Prop. Owner's, etc., Ass'n v. City Council, 55 N.J. at 100 Riccio v. N.J. Mfrs. Ins. Co., 179 N.J. Super. 65, 70 (App.Div. 1981).
*39 We are convinced that the purpose of the "public utility" exemption is to prevent business entities from being subjected to conflicting sets of governmental regulations. In our view, the statutory exception is designed to obviate potential conflicts where a public utility is required or permitted by the BPU to engage in anti-competitive activities that would otherwise be proscribed by the Antitrust Act. The exemption has been so construed in Borland v. Bayonne Hospital, 122 N.J. Super. 387, 406 (Ch.Div. 1973), aff'd o.b. 136 N.J. Super. 60 (App.Div. 1975), aff'd o.b. 72 N.J. 152 (1977), cert. den. 434 U.S. 817, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977) and Chick's Auto Body v. State Farm Auto Ins. Co., 168 N.J. Super. 68, 75 (Law Div. 1979), aff'd o.b. 176 N.J. Super. 320 (App.Div. 1980). Cf. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); California Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); Joseph H. Reinfeld, Inc. v. Schieffelin & Co., 94 N.J. 400, 416-417 (1983). Our construction of the exemption is in accord with federal decisions with respect to similar issues.[3]See, e.g., Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982); Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), reh. den. 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); Fed. Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), reh. den. 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 83 *40 S.Ct. 1246, 10 L.Ed.2d 389 (1963), reh. den. 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); California v. Fed. Power Comm'n, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); Georgia v. Penn. Rd. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).
We thus reject defendants' argument that the anti-competitive agreement alleged in the indictment and proven at trial fell within the exclusive jurisdiction of the BPU. Of course, we recognize that the BPU is vested with the authority to preclude monopolies in the solid waste collection and disposal businesses. See N.J.S.A. 48:13A-10. In furtherance of that statutory power, the BPU has promulgated regulatory provisions prohibiting agreements or combinations from limiting bidding or eliminating competition. N.J.A.C. 14:3-10.12. Moreover, conduct violative of the restraint of trade prohibition set forth in N.J.S.A. 56:9-3 may also fall within the purview of the monopoly proscriptions contained in N.J.S.A. 56:9-4 and N.J.S.A. 48:13A-10. See Maryland & Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 463, 80 S.Ct. 847, 851, 4 L.Ed.2d 880, 886 (1960); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211, 79 S.Ct. 705, 708, 3 L.Ed.2d 741, 744 (1959); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, n. 59, 60 S.Ct. 811, 846, n. 59, 84 L.Ed. 1129, 1170 (1940); Standard Oil Co. v. United States, 221 U.S. 1, 59-60, 31 S.Ct. 502, 515, 55 L.Ed. 619, 644-645 (1911). To that extent, anti-competitive activities consisting of restraints of commerce may fall within the regulatory powers conferred upon the BPU. Nevertheless, this does not mean that New Jersey's antitrust laws can never be applied in areas of the economy pervasively regulated by the BPU. There is no logical inconsistency between requiring a solid waste collection entity to satisfy regulatory standards established by the BPU and also to comply with the Antitrust Act. *41 Although the exemption created by N.J.S.A. 56:9-5b(3) is not a model of clarity, the legislative history clearly discloses that it was designed to prevent placing a public utility on the horns of a dilemma caused by inconsistent regulatory schemes. We hold that the statutory exemption is applicable only where the BPU has expressly or impliedly authorized the anti-competitive conduct which otherwise would fall afoul of the Antitrust Act.
So posited, it is abundantly clear that defendants' participation in the conspiracy constituted a violation of the Antitrust Act falling beyond the parameters of the exemption. Simply stated, we are not concerned here with anti-competitive activities expressly or impliedly permitted, encouraged or directed by the BPU. See, e.g., Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 335-336 (1981); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 564 (1978). It would, thus, be anomalous to apply the public utility exemption in a manner inconsistent with its essential purpose. Rather, the exemption must be anchored to the reason for its existence. We are entirely satisfied that the exemption is not applicable within the context of the facts presented here.[4]

II
Equally without merit is defendants' contention that the trial judge erred in denying their motion for a severance. Defendants' *42 primary argument is that a severance should have been granted because the vast bulk of the evidence presented at trial pertained to the guilt of their co-defendants. Defendants also claim that there was a prejudicial variance between the charge in the indictment and the proofs adduced at trial. Specifically, they argue that the State's evidence disclosed more than a single overall conspiracy. Defendants' final argument is that they were prejudiced when one of their co-defendants entered a plea of guilty during the course of the trial.
Preliminarily, we note that disposition of a motion for a severance pursuant to R. 3:15-2 is addressed to the sound discretion of the trial court. State v. Laws, 50 N.J. 159, 175 (1967), cert. den. 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Manney, 26 N.J. 362, 365 (1958); State v. Bellucci, 165 N.J. Super. 294, 300-301 (App.Div. 1979), mod. other grounds 81 N.J. 531 (1980); State v. Whipple, 156 N.J. Super. 46, 51 (App.Div. 1978). Denial of such a motion will not be reversed in the absence of a clear showing of a mistaken exercise of discretion. State v. Rosenberg, 37 N.J. Super. 197, 202 (App.Div. 1955). No error of that character is discernible in this record.
While it is true that most of the evidence presented at trial related to the guilt of the co-defendants, that fact, by itself, is not sufficient grounds for a severance.[5] We note that the potential for prejudice inherent in the mere fact of joinder does not of itself encompass a sufficient threat to compel a separate trial. A severance should not be granted "merely *43 because it would offer defendant[s] a better chance of acquittal." State v. Morales, 138 N.J. Super. 225, 231 (App.Div. 1975). Rather, it is incumbent upon the trial judge to weigh the interests of judicial economy and efficiency against the right of every accused to have the merits of his case fairly decided. State v. Aiello, 91 N.J. Super. 457, 466 (App.Div. 1966), certif. den. 48 N.J. 138 (1966), cert. den. 388 U.S. 913, 87 S.Ct. 2106, 18 L.Ed.2d 1351 (1967). "[T]he issue is not the respective weights of the evidence but the fairness of the trial as to each defendant." State v. Laws, supra, 50 N.J. at 175.
Although the danger of guilt by association underlies all joint trials, State v. Freeman, 64 N.J. 66, 68 (1973), this peril can generally be defeated by forceful instructions to the jury to consider each defendant separately. See State v. Laws, supra, 50 N.J. at 175; State v. Manney, supra, 26 N.J. at 368; State v. Bellucci, supra, 165 N.J. Super. at 300-301. We do not suggest that such a charge will always be sufficient to obviate the danger of undue prejudice. Our Supreme Court has observed that "[t]he question is whether a jury is likely to be unable to comply with the trial court's instructions." State v. Manney, supra, 26 N.J. at 368. It has been stated that courts "are ambivalent in their estimate of the intelligence of the layman, summoning one line of cases and then another to support the varying moods of their decisions." State v. Hawthorne, 49 N.J. 130, 147 (1967) (Weintraub, C.J., concurring). To some, resolution of the question depends upon whether one views the jury as composed of twelve persons of average intelligence or twelve persons of average ignorance. Note, 35 Brooklyn L.Rev., 139, 140 (1968). Here, we perceive no possible prejudice to defendants in view of the trial judge's repeated and carefully worded instructions on the subject of separate verdicts. Moreover, the jury's ultimate verdict, convicting four defendants while failing to resolve the question of the guilt or innocence of the others, convincingly demonstrates that they were able to comply with the court's charge. State v. Coleman, 46 N.J. 16, 25 (1965), cert. den. 383 U.S. 950, 86 S.Ct. *44 1210, 16 L.Ed.2d 212 (1966); State v. Cole, 154 N.J. Super. 138, 142 (App.Div. 1977), certif. den. 78 N.J. 415 (1978).
We also reject defendants' contention that the State's proofs at trial disclosed several unrelated conspiracies.[6] In essence, defendants claim that there was a prejudicial transference of guilt between conspirators participating in separate unlawful agreements. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Varelli, 407 F.2d 735 (7 Cir.1969), cert. den. sub nom. Saletko v. United States, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed. 581 (1972); United States v. Borelli, 336 F.2d 376 (2 Cir.1964). See also Cohen, "The Single Versus Multiple Conspiracy Problem," 2 Crim.Just.Q. 111 (1974); Comment, "Developments-Conspiracy," 72 Harv.L.Rev. 920 (1959); Note, "Single vs. Multiple Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes," 65 Minn.L.Rev. 295 (1980).
Examination of the record plainly belies defendants' contention. We are entirely satisfied that there was only one conspiracy  an unlawful combination to restrain competition through the assignment of exclusive rights to service particular areas and the utilization of prearranged bids. The Westfield grievance was perhaps a small but nonetheless an integral part of that illicit scheme. See State v. Louf, 64 N.J. 172, 176 (1973); State v. Yormark, 117 N.J. Super. 315, 336 (App.Div. 1971), certif. den. 60 N.J. 138 (1972), cert. den. sub nom. Mullvaney v. New Jersey, 407 U.S. 925, 92 S.Ct. 2459, 32 L.Ed.2d 812 (1972); State v. Coruzzi, supra, 189 N.J. at 300. We conclude that there was ample direct and circumstantial evidence to support the State's charge that defendants were involved in a single overall conspiracy to eradicate competition in the garbage collection industry.
*45 Nor are we persuaded that the decision of one of the co-defendants to plead guilty after the trial commenced in any way impaired defendants' rights. There is no support in the record for defendants' contention that the jury inferred guilt by virtue of the co-defendant's absence from the remainder of the trial. In our view, defendants' contention rests upon mere conjecture.
Lastly, we reject defendants' argument that they were tainted by evidence of violence which pertained to several of their co-defendants. Defendants refer to several isolated incidents which occurred during the course of the protracted trial. Although several of these incidents were unfortunate, they had no logical relevance to the defendants. Not every excursion beyond the rules of evidence necessitates a reversal of an otherwise valid conviction. We have carefully examined the record and are entirely satisfied that defendants were in no sense prejudiced.

III
It is next argued that the trial judge erred when he permitted defendants and their attorney to absent themselves from a substantial portion of the trial. Prior to selection of the jury, defendants and defense counsel expressly waived their rights to be present during those phases of the case relating to the co-defendants. The trial court ultimately acceded to defense counsel's request over the State's vigorous objection. Defendants now contend on appeal that the trial judge's decision requires reversal of their conviction. In support of their position, they heavily rely upon our decision in State v. Wiggins, 158 N.J. Super. 27 (App.Div. 1978), certif. den. 70 N.J. 512 (1976) and that of our Supreme Court in State v. McCombs, 81 N.J. 373 (1979).
Both decisions are clearly inapposite. In State v. McCombs, supra, defendant discharged his public defender attorney and advised the court of his intention to retain private counsel. The *46 court refused to delay the trial. The record disclosed that from the time jury selection commenced until completion of the prosecutor's opening statement, defendant neither represented himself nor was defended by counsel. We reversed defendant's conviction on the basis that the trial judge should have ordered the public defender to participate as vigorously as possible in the trial. 171 N.J. Super. 161, 169 (App.Div. 1979). The Supreme Court affirmed, stating that a "defendant cannot have it both ways  that is, he cannot refuse to represent himself but at the same time reject the services of assigned counsel." 81 N.J. at 378. Similarly, in State v. Wiggins, supra, 158 N.J. Super. at 31, we held that a defendant may not waive his right to counsel and then refuse to participate in his own defense. But see United States v. Dickens, 695 F.2d 765 (3 Cir.1982), cert. den. 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).
The facts here are clearly distinguishable. The record reflects that defendants neither sought to waive their right to counsel nor refused to participate in their defense. Absenting themselves from a major portion of the trial was plainly part of their overall strategy which was designed to distance themselves from their co-defendants. In pursuit of that tactic, Scioscia requested and was granted the right to sit in the gallery and not at the defense table. In his opening statement, defense counsel expressly alluded to the fact that he and his clients would not be present during portions of the trial. Defense counsel stated:
My client[s] and I have waived our rights to literally be here every day of the trial. It is not because we are not interested. It is not because we are not concerned. It is because [the conspiracy] doesn't involve us.
These sentiments were again expressed in defense counsel's summation. Counsel noted that his clients' decision not to be present at trial was not based upon a lack of concern or interest. Rather, counsel reiterated his contention that defendants were "not involved" in the conspiracy. According to defense counsel, defendant Scioscia was not acquainted with the State's principal witness and would not recognize him if *47 they were to meet in the courtroom. In short, we are not concerned here with an obdurate defendant who seeks to disrupt the course of a criminal trial. In contrast, defendants' voluntary waiver of their rights was made in pursuit of a trial strategy that ultimately proved unavailing.
Under these circumstances, we have no occasion to address the merits of the arguments belatedly advanced by defendants on appeal. Although defense counsel pursued a course fraught with danger, we cannot fairly say that his strategy was misconceived or unreasonable. While we harbor reservations with respect to the wisdom of permitting an accused and his attorney to absent themselves during portions of a trial, any error in that regard originated with the defendants and cannot serve as a vehicle for reversal on appeal. State v. Simon, 79 N.J. 191, 205 (1979); State v. McDavitt, 62 N.J. 36, 48 (1972); State v. Pontery, 19 N.J. 457, 471 (1955); State v. Bishop, 187 N.J. Super. 187, 194 (App.Div. 1982); State v. Harper, 128 N.J. Super. 270, 278 (App.Div. 1974), certif. den. 65 N.J. 574 (1974). "Elementary justice in reviewing the action of a trial [judge] requires that [the] court should not be reversed for an error committed at the instance of [the] party alleging it." Bahrey v. Poniatishin, 95 N.J.L. 128, 133 (E. & A. 1920). See also Titus v. Lindberg, 49 N.J. 66, 78 (1967); State v. McNeil, 164 N.J. Super. 27, 33 (App.Div. 1978), certif. den. 79 N.J. 497 (1979); Gilborges v. Wallace, 153 N.J. Super. 121, 139 (App.Div. 1977), aff'd in part and rev'd in part on other grounds, 78 N.J. 342 (1978); Venuto v. Lubik Oldsmobile, Inc., 70 N.J. Super. 221, 229 (App.Div. 1961). The only exception to this rule is when the errors are "of such magnitude that they trench directly upon the proper discharge of the judicial function." State v. Simon, supra, 79 N.J. at 205; State v. Harper, supra, 128 N.J. Super. at 278. Applying these standards, we are convinced that the trial judge's decision, if considered error, was not of such patent gravity as to compel vitiation of the jury's verdict. Cf. State v. Macon, 57 N.J. 325, 337 (1971).

*48 IV
Defendants' remaining arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2). We have carefully examined the grand jury minutes and are entirely satisfied that the evidence was sufficient to support the return of the indictment. See State v. New Jersey Trade Waste Ass'n, supra, 96 N.J. at 18-19; State v. Weleck, 10 N.J. 355, 364 (1952); State v. Porro, 175 N.J. Super. 49, 51 (App.Div. 1980). So too, defendants' motion for a new trial was properly denied. Indeed, the evidence of defendants' guilt was overwhelming. We perceive no justifiable basis to disturb the jury's verdict. State v. Carter, 91 N.J. 86, 96 (1982); State v. Sims, 65 N.J. 359, 373-374 (1974). See also Carrino v. Novotny, 78 N.J. 355, 360 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-598 (1977); Dolson v. Anastasia, 55 N.J. 2, 6-7 (1969). Accordingly, the judgments of conviction are affirmed.
NOTES
[1] We are today filing a separate opinion affirming the convictions of Louis Spiegel and Inter County Refuse Service, Inc. (A-191-83T4).
[2] Technically, the trial judge was incorrect when he imposed a custodial term and suspended execution of the sentence. N.J.S.A. 56:9-11 provides that a knowing violation of the Antitrust Act constitutes a misdemeanor. However, N.J.S.A. 2C:1-5b, N.J.S.A. 2C:1-4c and N.J.S.A. 2C:43-2a state that all persons convicted of an offense are to be sentenced in accordance with the Code of Criminal Justice. See Stern, "Preserving Jurisdiction Under the Code," 7 Crim.Just.Q. 1 (1979). Unlike prior law, the sentencing court under the Code is permitted to directly impose a probationary term. N.J.S.A. 2C:43-2b(2). It is no longer proper for the court to impose a custodial term and suspend execution of all or a portion of it.
[3] N.J.S.A. 56:9-18 provides that the New Jersey Antitrust Act is to be construed in harmony with judicial interpretations of comparable federal provisions. See State v. New Jersey Trade Waste Ass'n, 96 N.J. 8 (1984); Pomanowski v. Monmouth County Bd. of Realtors, 89 N.J. 306, 313 (1982), cert. den. 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982).
[4] That is not to say, however, that if such a regulatory conflict existed, the exemption would not be applicable. For example, solid waste collectors file tariffs of rates with the Board. These rates are then available for examination by the company's competitors. Such an exchange of current price information could be considered a violation of the antitrust law. United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Clearly, however, since such an exchange of information is permitted by the BPU, the antitrust law is inapplicable. Another example would be if the Board granted a particular collector a franchise territory pursuant to N.J.S.A. 48:13A-5. In that situation a collector would have a governmentally sanctioned monopoly which would be exempted from the antitrust law. Again, however, no such regulatory conflict exists in the present case. In re Application of Saddle River, supra.
[5] We note that even had defendants' motion for a severance been granted, much of the evidence pertaining to the conduct of other co-conspirators would have been admissible in any event. See Evid.R. 63(9). Under such circumstances, a separate trial would not have altered the disparity of the evidence pertaining to defendants and the other co-conspirators. Cf. State v. Coruzzi, 189 N.J. Super. 273, 299 (App.Div. 1983), certif. den. 94 N.J. 531 (1983); State v. Reldan, 167 N.J. Super. 595, 600-601 (Law Div. 1979), rev'd other grounds 185 N.J. Super. 494 (App.Div. 1982), certif. den. 91 N.J. 543 (1982).
[6] In State v. New Jersey Trade Waste Ass'n, supra, our Supreme Court rejected the argument that the indictment alleged separate conspiracies.