# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2415-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AARON T. BAILEY,

     Defendant-Appellant.

_____

Argued May 13, 2025 – Decided June 5, 2025

Before Judges Gooden Brown and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 22-06-0590.

Rachel A. Neckes, Assistant Deputy Public Defender argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel A. Neckes, of counsel and on the briefs).

Jaimee M. Chasmer, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Jaimee M. Chasmer, of counsel and on the brief; Edward F. Ray, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant Aaron Bailey was convicted of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(13); fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1); and fourth-degree stalking, N.J.S.A. 2C:12-10. Defendant was subsequently sentenced to an aggregate seven-year term with an eighty-five percent parole disqualifier under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.

The charges stemmed from a brief but tumultuous relationship between defendant and S.G.[1] The alleged criminal conduct occurred between February and May 2022 and involved S.G. receiving a restraining order under the Prevention of Domestic Violence Act ("PVDA"). The State alleged that defendant: (1) strangled S.G. to the point of unconsciousness on February 23; (2) slashed S.G.'s tires on April 4 after S.G. broke up with him; (3) violated a restraining order; and (4) stalked S.G. by engaging in a course of conduct, while having a restraining order, that was designed to place her in fear.

On appeal, defendant raises the following points for our consideration:

---

[1] We use initials for the parties to protect the identity of the individual who procured the domestic violence restraining order. See N.J.S.A. 2C:25-33; R. 1:38-3(d)(9).

POINT I:

[DEFENDANT]'S CONVICTION FOR AGGRAVATED ASSAULT MUST BE REVERSED BECAUSE THE COURT'S INSTRUCTIONS DID NOT REQUIRE THE JURY TO FIND THAT HE COMMITTED THE REQUISITE ACT AND ERRONEOUSLY DEFINED THE REQUIRED MENTAL STATE FOR ATTEMPT. (Not Raised Below).

POINT II:

[DEFENDANT]'S CONVICTION MUST BE REVERSED BECAUSE THE COURT EXCLUDED EXTRINSIC EVIDENCE RELEVANT TO IMPEACHMENT AND TO REBUTTING THE STATE'S CHARGES.

POINT III:

THE COURT'S FAILURE TO SEVER AND SANITIZE COUNTS THREE AND FOUR PRIOR TO TRIAL AND ITS ERRONEOUS JOINDER OF COUNTS ONE AND TWO VIOLATED [DEFENDANT]'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT IV:

THE CUMULATIVE EFFECT OF THE ERRORS DENIED [DEFENDANT] A FAIR TRIAL AND REQUIRES REVERSAL. (Not Raised Below).

Having reviewed the record, the parties' arguments, and the applicable legal principles, we reverse the convictions and remand for a new trial.

3

I.

We glean these facts from the trial record. At trial, S.G. testified to dating defendant for three months beginning in January 2022. Specifically, S.G. recounted that on the evening of February 23, 2022, she drove her car to defendant's home after a night out with friends. Defendant, who had a bottle of liquor in his hand, jumped into the passenger seat as S.G. parked and began angrily questioning S.G. if she had been with any men. Defendant then slapped S.G.'s face and grabbed her hair while shoving her head towards the center console, holding her head there, and screaming over her. During this encounter, S.G. managed to secretly record two videos capturing audio of the incident that were played for the jury. Defendant can be heard threatening S.G. and acknowledged that he was hurting her.

Fearing for her safety if she left, S.G. joined defendant in his basement apartment, where defendant soon became angry again. S.G. told defendant that she wanted to leave, which angered defendant who told her she could not leave. S.G. recorded a third video which captured some visual of the next assault in which defendant bear hugged and punched S.G. while repeatedly telling or challenging her to "[g]o home then." Eventually, defendant and S.G. got into bed and defendant demanded to see her phone. Defendant rolled on top of S.G.

to try to get her phone, which was on the floor next to the bed, and then tried to unlock it with facial recognition by forcing her head towards the phone. S.G. tried to use "Siri" to call 9-1-1, but defendant cancelled the call before it connected.

Following the attempted 9-1-1 call, a fight ensued in which defendant choked S.G. until she lost consciousness and passed out. When S.G. woke up, defendant's mood had changed, and he cuddled her and told her that he loved her. S.G. testified that she had a bruise on her neck, lost her voice, and that defendant would not let her leave his side for the next three days. S.G. stated that she was afraid to leave or deviate from his instructions because he had threatened her children and friends if she did not comply.

Defendant and S.G. broke up for good a few days later, when S.G. went to defendant's apartment to pick up her belongings at a time she believed he would be at work. Defendant, however, was home that day, and the matter turned physical and ended when S.G. left with a few items. S.G. stopped communicating with defendant and blocked his phone number and social media accounts and then took her children away from home for a few days out of fear for their safety.

S.G. also testified that on April 4, 2022, at about 3:00 p.m., she heard a car screech and looked outside from her second-floor window. S.G. saw a man leaving a gray sedan with a handicap sticker, wearing a full-faced orange ski mask with dark pants, dark long sleeves, and a knife approaching her Ford Explorer parked in her driveway. S.G. recounted that she called out to him, but the man laughed and slashed the passenger-side tires with a knife before running back to the sedan and driving off. S.G. identified defendant as the tire-slasher based on his laugh, body language, and stature. Her children arrived home from school a few minutes later and after S.G. quickly brought them inside, she called the police to report the incident.

Midland Park Police Officer Michael Divite testified that on April 4, 2022, he was on routine patrol. Around 3:30 p.m., he received "a call for service for a party with a possible weapon" at S.G.'s address. He also received a description of the gray sedan. Officer Divite canvassed the area for the car, while another officer responded immediately to S.G.'s home. Officer Divite arrived at S.G.'s house about "two minutes" later. The officers spoke with S.G., who reported what happened. Officer Divite observed punctures in both passenger-side tires on S.G.'s truck. After twenty to thirty minutes, Officer Divite transported S.G. to the police station. S.G. provided a written statement, including details of the

February 23 incident. S.G. also reported to police that she was afraid of defendant because he was "abusive" and had threatened her "with going after [her] kids [and] friends." He had "threatened to kill [her]" and had "threatened [her] with revenge porn."

While at the station, around 4:14 p.m., S.G. received a notification on her phone that defendant had sent her a message on TikTok. However, the message was gone when S.G. tried to open it. Officer Divite transported S.G. home after she completed her paperwork.

Separately, defendant made a call to Paramus Police that same afternoon. Defendant contacted the police at 3:11 p.m. about "threatening text messages" that he had received from an unknown phone number at 7:49 a.m. that day. Paramus Police Officer Henry Ramm testified that he was dispatched to defendant's Paramus apartment at 3:27 p.m. on April 4. Defendant did not tell Officer Ramm who could have sent him the message. He reported that the number was out of service when he tried to call back. Officer Ramm testified that he was with defendant until about 3:40 to 3:50 p.m.

Shortly thereafter, Paramus Police returned to defendant's apartment in relation to the investigation of the tire slashing. Paramus Police Officer Jonathan Henderson testified that, on April 4, he received a call "a little after

4:00 p.m." from Midland Park Police requesting that he "check" defendant's house to "see if [defendant] was there." Officer Henderson arrived around 4:17 p.m. and attempted to "make contact" with defendant, but defendant was not there. By 8:30 p.m., Paramus Police were able to locate and arrest defendant at his apartment.

Alexander Rivera, a manager at ETD Discount Tire, testified that on April 5, 2022, S.G. ordered replacement tires. The cost of replacing the two damaged tires was $540.99. S.G. also testified that the cost of replacing the tires was "[j]ust over [$]500."

At trial the parties stipulated that the distance between defendant's and S.G.'s residences was "8.7 miles using New Jersey 17 South, 9.2 miles using New Jersey 208 South and 7.3 miles via Century Road."

S.G. also reported defendant's social media posts to the police, including a post made by defendant in which, despite being blocked by S.G., he reposted a screenshot of one of her posts. Midland Park Police Officer Michael Powderly testified that S.G. reported the social media posts to the police. Officer Powderly stated that he referred the matter to the Bergen County Sheriff's Department.

A-2415-22

Jeffery Ramirez from the Bergen County Sheriff's Department testified that upon report of the social media posts, he located a phone call from May 6, 2022, between defendant and Shelby Bailey. On the call, defendant instructed Shelby to take screenshots of S.G.'s posts, post them to his own Facebook and write "how this bi*** accused me of going and flatting her tires and all this bulls**t and accused me of choking her out . . . ." He told the woman to "sell her out . . . but don't contact her directly . . . . Because . . . you can get in trouble for that." The jury was not told that the conversation was taken from a recorded jail call between defendant and his estranged wife.

On June 28, 2022, a grand jury issued an indictment against defendant, charging him with: second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(13) ("Count One"); fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1) ("Count Two"); fourth-degree contempt, N.J.S.A. 2C:29-9(b) ("Count Three"); and third-degree stalking, N.J.S.A. 2C:12-10(c) ("Count Four"). Stalking was elevated from a fourth-degree to a third-degree offense because the alleged criminal conduct occurred while defendant was subject to a domestic violence restraining order.

On January 9, 2023, defendant filed a motion to sever the counts of his indictment seeking to try counts one and two independently from each other,

followed by a third trial on counts three and four. When commencing voir dire of each of the three jury panels on January 10, 11, and 12, the court informed the panels of all four charges in the indictment against defendant. Following jury selection, the court issued an order severing count three and sanitizing count four (by deleting reference that the alleged stalking was in violation of an existing court order) but denied defendant's requests for severance of counts one and two.

On January 18, 2023, testimony commenced on counts one, two, and the sanitized count four. On the morning before the State began its case-in-chief, defense counsel sent the State and court a new list of potential exhibits, including a video recovered from defendant's phone. The video was allegedly recorded by defendant almost two weeks after the strangulation incident and two weeks before their final break up, and is of an interaction between himself and S.G. The video is filmed from the point of view of defendant and begins with him standing outside his apartment. Defendant walks through the open, exterior door to the basement level of his apartment and repeatedly states "I've asked you to leave" to S.G. S.G. is down a hallway and goes in and out of view throughout the video. She responds "I'm f***ing getting my s**t" and "keep your hands off of me." During the argument, defendant, who walks inside and outside of his

apartment says "get your stuff and leave" to which S.G. responds, "I'm trying to leave, but you wouldn't let me." S.G. also asks, "what the f**k is wrong with you" and tells defendant to call the police. S.G. can be seen down the hallway on her phone. Defendant keeps repeating "please leave" and says "you said you were getting your stuff . . . ok then please do that" while backing out of the door to head back outside. S.G. follows defendant and can be seen standing near the doorway looking at her phone and attempting to show defendant whatever is on it. Defendant, standing outside, states that he does not care about any of this and says that S.G. attacked him before he began filming. The video then ends.

Defense counsel sought to impeach S.G. with the video during cross-examination. The court first stated that it would allow defense counsel to use the video for impeachment but, upon the State's motion for reconsideration, found that the video contained inadmissible hearsay and that counsel could only impeach the witness with a transcript of her own statements from the video. The court determined there was no excuse for the late turnover of the video and denied defendant's additional requests to introduce the video and denied his motion for reconsideration.

11

On February 1, the jury convicted defendant of all charges. The State subsequently dismissed the severed count three and did not seek an enhanced penalty on the sanitized count four.

The court sentenced defendant on March 3, 2023, and imposed an aggregate seven-year term with an eighty-five percent parole disqualifier as follows: a seven-year NERA sentence for second-degree aggravated assault; a concurrent one-year sentence for fourth-degree criminal mischief; and a concurrent one-year sentence for fourth-degree stalking. The judge also ordered defendant to pay related fines and restitution.

## II.

We now address the arguments raised by defendant, reordering and combining them in some respects for ease of discussion.

## A.

Defendant argues that the court's untimely order in severing the contempt charge and sanitizing the stalking charge resulted in improper disclosure of the restraining order to the jury. Defendant contends this created an undue prejudice that could not be overcome by an untimely and non-specific instruction to the jury.

Rule 3:15-1 governs the permissible and mandatory joinder of charges and defendants in criminal cases. "Joinder is permitted when two or more offenses 'are of the same or similar character or are based on . . . [two] or more acts or transactions connected together or constituting parts of a common scheme or plan.'" State v. Morton, 155 N.J. 383, 451 (1998) (first alteration in original) (quoting R. 3:7-6). Mandatory joinder is required when multiple criminal offenses charged are "based on the same conduct or aris[e] from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court." R. 3:15–1(b).

Notwithstanding the preference for joinder, Rule 3:15-2(b) provides for relief from prejudicial joinder in criminal trials. See State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (decision whether to sever an indictment rests in sound discretion of trial court); State v. Weaver, 219 N.J. 131, 149 (2014) (decision to sever is within the trial court's discretion, and it will be reversed only if it constitutes an abuse of discretion); State v. Sterling, 215 N.J. 65, 72–73 (2013); State v. Krivacska, 341 N.J. Super. 1, 37 (App. Div. 2001) (disposition of a motion for a severance under R. 3:15-2 is addressed to the sound discretion of the trial court).

In Chenique-Puey, our Supreme Court held that admission of evidence of a domestic violence restraining order was unduly prejudicial to defendant in a terroristic threats to kill trial, and therefore severance of the charge was necessary. 145 N.J. at 337. The Chenique-Puey Court stated that evidence of the restraining order was inadmissible to prove terroristic threats and that admission of the order could unduly prejudice the defendant by bolstering the victim's testimony regarding defendant's prior bad acts because "[a] jury could interpret the order as a judicial imprimatur on the victim's testimony. The order creates the inference that if a court found defendant guilty of domestic violence in a prior proceeding, that defendant is more likely guilty of the present terroristic-threat charges." Id. at 343. The jury might understand such an order as a symbol of judicial endorsement of a victim's testimony, making it "highly damaging" to a defendant's case. State v. Vallejo, 198 N.J. 122, 134 (2009); see Chenique-Puey, 145 N.J. at 343.

Likewise, in Lozada, in reaching the conclusion that the trial court erred in failing to sever the charges of stalking and contempt of a restraining order, we relied on the decision in Chenique-Puey. State v. Lozada, 357 N.J. Super. 468, 470 (App. Div. 2003). We stated that the jury's knowledge of a restraining order was likely to prejudice defendant's right to a fair trial of whether he is

A-2415-22

guilty of stalking pursuant to N.J.S.A. 2C:12-10c. Id. at 472. For this reason, our courts have been instructed that in trials for stalking to first try the fourth-degree version of the crime, without reference to a restraining order; then, if the defendant is convicted, the State may, before the same jury, try the enhanced third-degree crime and introduce evidence of an existing restraining order to the jury. Id. at 472-73.

Here, by following Chenique-Puey and Lozada, the court properly determined that the contempt count (count three) needed to be severed from the remaining counts and the stalking count (count four) needed to be sanitized so that it did not mention that "it was in violation of an existing court order prohibiting such behavior." As such, the jury was tasked with originally determining if defendant committed aggravated assault, criminal mischief, and fourth-degree stalking.

However, that is not where our analysis ends as defendant posits that the court committed reversible error when, during voir dire, it read the original indictment to the jury panels creating an undue prejudice. This included the later severed allegations that defendant committed contempt because he was subject to a restraining order, and that he also was accused of violating the court order by "stalking." Although defendant had filed the motion for severance

before this was read to the jury panel, defendant did not object to the reading of the indictment to each of the jury panels.

When a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022); State v. Singh, 245 N.J. 1, 13 (2021); State v. Gore, 205 N.J. 363, 383 (2011). This includes when a defendant fails to object to an error regarding a jury charge. State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." Ibid. "In the context of a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)) "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" Clark, 251 N.J. at 287 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

In the present case, we find that it was plain error for the jury to hear about the restraining order during jury selection. Although the trial court acknowledged this prejudice, and eventually severed the counts, the damage had already been done. The implication jurors were left with throughout the trial was that another court had already found there was domestic violence and therefore there was an inference that the defendant was more likely to commit other domestic-violence-related offenses. Chenique-Puey, 145 N.J. at 343. Moreover, in a case that was focused entirely on credibility, the jurors were left with the inference that another court had already endorsed the victim's testimony. These implications were highly prejudicial and were further compounded because there was not a timely and specific curative jury instruction.

The State's contention that the court provided a sufficient remedy to rectify the initial prejudice is without merit. When inadmissible evidence of a restraining order is presented to a jury, the court must give a curative instruction "to alleviate potential prejudice to a defendant," or defendant is entitled to reversal of his or her conviction. Vallejo, 198 N.J. at 135. The instruction, moreover, must generally "be firm, clear, and accomplished without delay." Id.

at 134; <u>see also</u> <u>State v. Prall</u>, 231 N.J. 567, 586, (2018) (explaining that "a curative instruction may sometimes be a sufficient remedy").

Here, during the final charge, the trial court stated

> When this trial began, I told you about the charges that were contained in the indictment and I also explained that the indictment is not evidence but merely a written document that brings the charges before a jury so that the jury can decide whether the [d]efendant has been proven guilty beyond a reasonable doubt. As the judges of the law, it is my responsibility to review those charges with the attorneys at the end of the case to decide which charges will be submitted to you for deliberation. Sometimes as a matter of law, I may determine that not every charge within the indictment should be submitted to you for deliberations and at other times, as a matter of law, I may determine that certain—certain charges not originally within the indictment should be submitted to you for deliberations. Here, I have ruled that you are to consider the three charges that were presented to you during the course of this trial.

Providing this instruction at that point in the trial did not cure the damage from the information sitting with the jury throughout the entire trial. This instruction was also general and fails to mention or even address the restraining order. Moreover, defendant's agreement that "this was the least prejudicial" way to deal with the issue, was not a waiver of his right to a fair trial. As such, we are constrained to vacate the convictions and remand for a new trial on counts one, two, and sanitized count four.

18

B.

Because we have found there was a violation of defendant's right to a fair trial that requires reversal of the convictions, we address defendant's remaining arguments only to the extent they present issues that may arise on retrial.

i.

Defendant contends that the court committed error when it refused to sever the aggravated assault charge (count one) from the criminal mischief charge (count two). We are not persuaded by that argument. Where offenses are properly joined, "[the] defendant bears the burden of demonstrating prejudice" to warrant severance. State v. Lado, 275 N.J. Super. 140, 149 (App. Div. 1994). However, "the potential for prejudice inherent in the mere fact of joinder does not of itself encompass a sufficient threat to compel a separate trial." State v. Scioscia, 200 N.J. Super. 28, 42 (App. Div. 1985). Instead, in deciding a severance motion, the trial court must "weigh the interests of judicial economy and efficiency against the right of every accused to have the merits of his [or her] case fairly decided." Id. at 43.

While judicial economy and efficiency are important considerations, the "key factor in determining whether prejudice exists from joinder of multiple offenses 'is whether the evidence of [those] other acts would be admissible in

19

separate trials under [N.J.R.E. 404(b)].'"  State v. Krivacska, 341 N.J. Super. 1, 38 (App. Div. 2001) (alterations in original) (quoting State v. Moore, 113 N.J. 239, 274 (1988)).  "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he [or she] would in separate trials.'"  Chenique-Puey, 145 N.J. at 341 (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Counts one, two, and the sanitized version of count four were all linked because the crimes demonstrated a complete picture of the turbulent relationship and proved defendant's motive to control S.G.  Moreover, defendant makes no mention of severing the sanitized fourth-degree stalking count which was joined with the aggravated assault and criminal mischief charges.  Therefore, the conduct making up the aggravated assault and criminal mischief charges is intrinsic to the stalking count.  See State v. Rose, 206 N.J. 141, 180 (2011) ("[E]vidence is intrinsic if it 'directly proves' the charged offense.").  Additionally, each of the counts would be admissible under a Cofield[2] analysis.  Thus, defendant's argument for severance is without merit.

---

[2]  State v. Cofield, 127 N.J. 328 (1992).

Next, defendant posits the court's jury charge, for aggravated assault by strangulation of a victim of domestic violence was deficient because: (1) the trial court did not instruct the jury that it must find appellant committed the act of strangulation; and (2) the trial court provided the wrong mens rea to the jury. We need not examine these contentions other than to highlight that at the time of the trial no model jury charge existed for N.J.S.A. 2C:12-1(b)(13), but since then one has been approved.[3] On retrial the model jury charge should be read, as it alleviates the concerns defendant raises on appeal.

Last, defendant alleges the court abused its discretion in only allowing him to use a transcript of the encounter with the victim that was recorded on his cell phone.

Our review of a court's discovery order is governed by the abuse of discretion standard. State v. Garcia, 245 N.J. 412, 430 (2021); State ex rel. A.B., 219 N.J. 542, 554 (2014). "[A]ppellate courts 'generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its

---

[3] Model Jury Charges (Criminal), "Aggravated Assault-Strangulation of A Victim of Domestic Violence (N.J.S.A. 2C:12-1(b)(13))" (Apr. Nov.13, 2023).

determination is based on a mistaken understanding of the applicable law.'" State v. Brown, 236 N.J. 497, 521 (2019) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)). "A court abuses its discretion when its 'decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020) (third citation omitted)). A trial court can abuse its discretion "by failing to consider all relevant factors . . . ." State v. S.N., 231 N.J. 497, 500 (2018). If, however, the trial court applied the wrong legal standard in deciding to admit or exclude the evidence, the court's evidentiary decision is reviewed de novo. State v. Trinidad, 241 N.J. 425, 448 (2020).

The court stated that

> It is wholly unreasonable for defendant to ambush the trial causing both the State and the court to deflect a continually changing theory of the need for the video at - at issue. Here, the [c]ourt and the State became aware of the piece of evidence well into the trial in spite of defendant[] having had it earlier.

The court concluded that the fairest outcome for the discovery violation was to allow the defense to use a transcript of the video for its stated purpose: impeaching S.G.'s credibility. Given the late disclosure, the trial court did not abuse its discretion in allowing defense counsel to impeach S.G. using the

transcript, highlight favorable facts from the video during questioning, and comment on the video's content during closing arguments. However, since the case is being retried, the prejudice caused by the defendant's failure to timely disclose the video tape is no longer an issue. The defendant is now permitted to renew the motion, and both parties will be given the opportunity to present their arguments as to whether there are any evidentiary impediments to the admission of the video. As this decision also rests within the trial court's discretion, we express no opinion on whether the video should be allowed to be played to the jury.

Reversed and remanded for a new trial in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division