**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5915-17
A-1243-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LAVELLE DAVIS,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JIMMY P. MAYS,

     Defendant-Appellant.

_____

        Submitted (A-5915-17) and Argued (A-1243-18)
        January 27, 2021 – Decided October 8, 2021

        Before Judges Whipple, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-05-1348.

Joseph E. Krakora, Public Defender, attorney for appellant Lavelle Davis (Michele A. Adubato, Designated Counsel, and Alison Perrone, First Assistant Deputy Public Defender, on the briefs; Amanda Savage, Assistant Deputy Public Defender, of counsel and on the briefs).

Anthony J. Vecchio, Designated Counsel, argued the cause for appellant Jimmy P. Mays (Joseph E. Krakora, Public Defender, attorney; Jodi Ferguson, Assistant Deputy Public Defender; Anthony J. Vecchio, and Michael Robbins, Designated Counsel, on the briefs).

Emily M. M. Pirro, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the briefs).

Appellant Lavelle Davis filed a pro se supplemental brief.

Appellant Jimmy P. Mays filed a pro se supplemental brief.

The opinion of the court was delivered by

WHIPPLE, J.A.D.

In these back-to-back appeals, defendants Lavelle Davis and Jimmy P. Mays appeal their judgments of conviction after their jury trial. We affirm all convictions and remand for resentencing.

We glean the following facts from the record. On the morning of January 29, 2017, Naya Riley was concerned when her father, Michael Davis (Michael),[1] did not answer his phone. She went to his Maplewood home to check on him. She found his car parked outside but the door was locked, so she called the police to request a welfare check. The fire department responded and discovered Michael and his girlfriend, Roshana Kenilson, both dead from gunshots to the head, apparently through pillows to muffle the sound.

There were no signs of forced entry, but the bedroom was ransacked, with boxes and furniture drawers opened and with their contents emptied around the room, and clothing taken from the closet and thrown on the floor. Duct tape remnants were found on the main floor, and blood stains were found on the wall behind a couch in the living room. Another blood stain encompassed two to three kitchen floor tiles. More blood stains, one impressed with a footprint, led downstairs to the basement, where a third

---

[1] We refer to Michael Davis by his first name only to avoid confusion with defendant Lavelle Davis. In doing so we mean no disrespect.

victim, Lance Frasier, was found dead with his legs and arms bound. More duct tape, one piece with a fragment of a blue latex glove stuck to it, was found in the basement, along with a shattered, black-tinted glass coffee table.

The police began an investigation that led to Frasier's house in Newark, where he worked for Michael's drug dealing operation. The lock on his door was broken off. A search inside yielded a bag of marijuana, 440 grams of heroin, various drug packaging materials, a box of ammunition, a cell phone, and documents belonging to Frasier.

Autopsies confirmed gunshot wounds to the head caused Michael's and Kenilson's deaths. Frasier was also shot in the head. His eye was swollen from blunt force trauma, and scratches and abrasions marred his face, forearms, and shoulders. He had lacerations on his eyelid and lips, three lacerations on the side of his head, cuts on his elbows, and four stab wounds on his buttocks. A ballistics analysis showed that two different guns fired the bullets that killed the three victims.

Ayesha Murray, a friend of Michael's, went to his house at 6:00 p.m. the night before the police found the victims. Frasier was also there. Michael's cell phone records show that at 7:57 p.m., he received a text message from a number beginning with 914 stating, "on the road, hour." The 914 number was

4

associated with a pre-paid cell phone card that Davis had purchased a few weeks earlier. Surveillance footage showed a black GMC Yukon parked near the home at 9:26 p.m., and an Infiniti QXS6 drove by the home at approximately 10:00 p.m.

Murray left the house to catch a cab, and she saw the silver Infiniti pass by while she and Michael were standing outside. She recognized the driver as a friend of Michael's, whom she knew as "Bro." When her cab arrived, she walked to the curb to get in and saw Bro walking back toward the home without the car. She greeted him, but he did not respond and walked past her and into Michael's house. At trial, she identified Bro as Mays.

A neighbor observed Michael walking his dog down the street sometime between 10:00 and 10:30 p.m. Phone records show beginning at 10:14 p.m., the 914 number began exchanging a series of messages with a 702 number, linked to a second pre-paid cell phone card Davis had purchased. The exchange continued through 2:26 a.m. with the following messages:

914 to 702: "Yo."

702 to 914: "Yoo."

914 to 702: "Show time. 2 bitches same spot."

702 to 914: "Hit me."

A-5915-17

914 to 702: "Shorty [girl] popped."

914 to 702: "Talk to me."

702 to 914: "Hour."

914 to 702: "Say that shorty posted up."

702 to 914: "Both the homies still there?"

914 to 702: "Yes, sir."

914 to 702: "Around?"

702 to 914: "Ten minutes."

914 to 702: "Cool.  Kids just went to bed.  Give a little."

702 to 914: "How we looking?"

914 to 702: "Stomach messed up.  About to use the Bathroom."

914 to 702: "Yo."

702 to 914: "Yoo."

914 to 702: "Dumbass baby on the other couch in and out.  We was looking for a bottle to put him to sleep.  Can't find one.  Bout to go the way you come open."

914 to 702: "Walk him up to the other babies unless you want me to walk him with me so can feed his crying ass."

702 to 914: "We can tie him up right where he at.  Then get upstairs."

6

914 to 702: "Was saying less down there.  Get what I'm saying?  Music on but okay."

914 to 702: "Cool though."

702 to 914: "Just got to be fast and quiet so we don't wake the upstairs up."

914 to 702: "You out there?"

702 to 914: "Yeah."

914 to 702: "Come on."

702 to 914: "Door."

914 to 702: "Bac[k] open."

702 to 914: "Front or back?"

914 to 702: "Back open."

702 to 914: "Two minutes."

702 to 914: "You meeting us downstairs?"

914 to 702: "Come on."

914 to 702: "Yo."

702 to 914: "Here."

Kenilson arrived at some point in the evening.  Neighborhood surveillance footage showed two men exiting the black Yukon at 2:23 a.m., around the same time the last message was sent.  The same neighbor who had

7

earlier seen Michael walking the dog recalled hearing the dog screech and a "pop sound" sometime between 2:00 and 3:00 a.m. Surveillance footage showed the Infiniti leaving at 3:48 a.m. and the Yukon at about 3:50 a.m.

Surveillance footage, GPS data, and toll booth license plate readers tracked the Yukon leaving and traveling to Frasier's house, arriving at approximately 4:11 a.m. Footage showed two individuals exit the car, return holding items that they did not have earlier, and drive away at approximately 4:40 a.m. Toll booth records showed the Yukon traveling on the Garden State Parkway to the Barnegat Toll Plaza, not far from Davis's girlfriend's address. The Infiniti, meanwhile, traveled southbound on the Parkway and then took the New Jersey Turnpike until exiting near the Delaware Memorial Bridge.

A January 13, 2017, surveillance video from a Dollar Express store in Pleasantville captured Davis buying two cell phones and two pre-paid minute cards linked to the same 914 and 702 numbers and leaving in a large black vehicle. Davis's girlfriend confirmed that Davis was using her black Yukon. She testified that she and Davis often traded between two cars, both in her name, but that the Yukon was his car and that he had it between January 20th and 30th.

The police searched the Yukon and found six cell phones, a folding knife, paperwork in Davis's name, and a glass fragment tinted black on one side and stained with a substance that appeared to be blood. The fragment was consistent with the glass from the broken coffee table in Michael's basement, and DNA testing on the stain revealed that the blood belonged to Frasier.

Mays's girlfriend confirmed Mays was using her Infinity QX56 around the time of the murders. A search of that vehicle revealed a wallet and two identification cards belonging to Mays. The stain found on the instep of a boot he was wearing at his arrest tested presumptively positive for the presence of blood, but the sample was not sufficient for DNA extraction or further analysis.

In May 2017, both defendants were indicted, charged with three counts of first-degree purposeful and knowing murder, N.J.S.A. 2C:11-3(a); two counts of second-degree burglary, N.J.S.A. 2C:18-2; one count of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree armed robbery, N.J.S.A. 2C:15-1; second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon with an unlawful

9

purpose, N.J.S.A. 2C:39-4(a); and third-degree criminal restraint, N.J.S.A. 2C:13-2.

The jury trial was held between April 3 and May 11, 2018. The State presented the largely circumstantial evidence outlined above and pursued a theory that both defendants knew Michael and his drug business and, with an unidentified third co-conspirator, targeted him to steal his money or drugs. Delmont McKenney, a heroin dealer who often bought supply from Michael, testified. He explained how he would order drugs from Michael and pick them up from Frasier at 42 Taylor Street. He was familiar with Michael's friends, including both defendants, and he testified that Mays often vacationed with him and Michael and was present once when McKenney and Michael talked about drugs. McKenney testified that Mays knew where Frasier hid his drug stash.

Murray testified about what she saw that night. Investigating and responding officers testified. Other police witnesses explained the processes used to identify the cell phone exchanges and other forensic evidence including blood stains.

The jury acquitted defendants of one burglary charge but found both guilty on all other counts of the indictment. On June 26, 2018, the judge

10

sentenced Davis and Mays to aggregate prison terms of 138 and 153 years, respectively, each subject to a period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, and imposed appropriate fines and penalties.

Both appealed. We address each defendant's arguments herein.

Mays raises the following arguments in his counseled brief:

> I. DEFENDANT WAS DENIED A FAIR TRIAL BY THE TRIAL COURT'S ADMISSION OF EVIDENCE AND TESTIMONY REGARDING THE UNCONFIRMED RESULTS OF THE PHENOLPHTHALEIN TEST CONDUCTED ON A STAIN FOUND ON DEFENDANT'S BOOT.
>
> II. DEFENDANT WAS DENIED A FAIR TRIAL BY THE TRIAL COURT'S ADMISSION OF EVIDENCE WHERE ITS PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY ITS UNFAIR PREJUDICE, WARRANTING REVERSAL OF DEFENDANT'S CONVICTIONS. (Raised by co-defendant)
>
> III. THE TRIAL COURT ERRED BY ADMITTING CERTAIN IRRELEVANT TEXT MESSAGES.
>
> IV. THE TRIAL COURT ERRED BY ADMITTING 'EXPERT' TESTIMONY FROM DET. KOHRT IDENTIFYING THE MAKE AND MODEL OF A CERTAIN VEHICLE DEPICTED ON A VIDEO RECORDING.
>
> V. THE TRIAL COURT ERRED BY NOT DECLARING A MISTRIAL OR DISMISSING JUROR NUMBER [SEVEN] AFTER THAT JUROR WAS INTIMIDATED BY AUDIENCE MEMBERS.

11

VI. DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF TRIAL COUNSEL'S ELICITATION OF DEFENDANT'S KNOWLEDGE OF MICHAEL DAVIS'S AND LANCE FRASER'S DRUG DISTRIBUTION. (Not raised below)

VII. THE TRIAL COURT ERRED BY ADMITTING A FACEBOOK PHOTOGRAPH DEPICTING THE DEFENDANTS AND VICTIM MICHAEL DAVIS WHERE THE PHOTOGRAPH[] WAS NOT PROPERLY AUTHENTICATED.

VIII. THE TRIAL COURT ERRED IN REFUSING TO GIVE THE JURY A CRITICAL CHARGE REGARDING CIRCUMSTANTIAL EVIDENCE. (Raised by co-defendant)

IX. THE EFFECT OF THE CUMULATIVE EVIDENTIARY ERRORS BY THE TRIAL COURT DEPRIVED DEFENDANT OF A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS. (Not raised below)

X. THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

XI. THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

In a supplemental pro se brief Mays raised the following additional argument:

POINT I
THE APPELLANT WILL SUBMIT THAT HIS DUE PROCESS AND RIGHT TO A FAIR TRIAL WAS VIOLATED UNDER THE FIFTH AND

12

FOURTEENTH AMENDMENTS TO THE NEW JERSEY AND UNITED STATES CONSTITUTION[S] AND IN VIOLATION OF APPELLANT'S SIXTH AMENDMENT [RIGHTS] UNDER THE UNITED STATES CONSTITUTION AND ART. 1, PARA. VI UNDER THE NEW JERSEY CONSTITUTION WHEN THE TRIAL COURT FAILED TO CONDUCT FURTHER VOIR DIRE CONCERNING CONTINUOUS OUTSIDE INFLUENCE AFTER A JUROR WAS THREATENED.

Davis raised the following points in his counseled brief:

POINT I
IT WAS ERROR FOR THE COURT TO DENY THE DEFENSE MOTION FOR MISTRIAL BASED UPON THE INCIDENT INVOLVING THE EMOTIONALLY DISTRAUGHT JUROR.

POINT II
THE DENIAL OF DEFENDANT'S MOTIONS FOR MISTRIAL AND SEVERANCE WAS ERROR WHICH DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT III
THE TRIAL COURT'S FAILURE TO DECLARE A HUNG JURY AFTER THE JURY STATED THEY WERE UNABLE TO REACH A[] UNANIMOUS VERDICT WAS ERROR AND DENIED DEFENDANT A FAIR TRIAL.

POINT IV
IT WAS ERROR FOR THE COURT TO REFUSE TO GRANT DEFENDANT'S REQUEST TO CHARGE ON INFERENCES.

13

POINT V
COMMENTS MADE BY THE PROSECUTOR
DURING HIS SUMMATION WERE PREJUDICIAL
AND DEPRIVED DEFENDANT [OF] A FAIR
TRIAL.

POINT VI
THERE WAS INSUFFICIENT RELIABLE
EVIDENCE TO SUPPORT THE DEFENDANT'S
CONVICTIONS BEYOND A REASONABLE
DOUBT.

POINT VII
THE AGGREGATE SENTENCE IMPOSED UPON
MR. DAVIS OF 117 YEARS WITH [THREE-AND-
A-HALF] YEARS OF PAROLE INELIGIBILITY
WAS EXCESSIVE AND SHOULD BE REDUCED.

POINT VIII
THE AGGREGATE OF ERRORS DENIED
DEFENDANT A FAIR TRIAL. (Not raised below)

Davis submitted the following points in a supplemental pro se brief:

POINT I
THE COURT ERRED BY ADMITTING CELL []
PHONE COMMUNICATIONS WITHOUT
PROPERLY AUTHENTICATING AND
IDENTIFYING THE DECLARANT PURSUANT TO
N.J.R.E. 901 [AND] N.J.R.E. 803(B)(5) THUS
DEPRIVING DEFENDANT TO HIS
CONSTITUTIONAL RIGHT TO DUE PROCESS
[AND] A FAIR TRIAL.

POINT II
THE COURT ERRED BY FAILING TO VOIR DIRE
THE JURY AND DECLARE A MISTRIAL
BECAUSE OF THE SERIES OF CONCERNING

14

ISSUES EXPRESSED BY THE JURORS THUS VIOLATING DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.

POINT III
THE TEXT MESSAGES SHOULD NEVER HAVE BEEN ADMITTED BECAUSE THE PREJUDICE WAS OUTWEIGHED BY THE PROBATIVE VALUE AND SENDERS AND REC[EI]VERS OF THE TEXT MESSAGES WERE NEVER ESTABLISHED VIOLATING DEFENDANT[']S RIGHT TO DUE PROCESS AND A FAIR TRIAL.

POINT IV
THE COURT ERRED IN FAILING TO GIVE CAUTIONARY OR LIMITING INSTRUCTIONS REGARDING THE LIMITED USE OF THE TEXT MESSAGES VIOLATING DEFENDANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

POINT V
THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTION THEREFORE THIS DEFENDANT'S CONVICTION MUST BE OVERTURNED.

POINT VI
THE CUMULATIVE ERRORS OF DEFENDANT'S TRIAL CREATED A SETTING WHICH WAS FUNDAMENTALLY UNFAIR THEREFORE DENYING DEFENDANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

We first address trial-related arguments common to both defendants.

A-5915-17

## I.

Both defendants argue that the court abused its discretion in failing to declare a mistrial because of improper influence or intimidation after an incident involving an emotionally distraught juror.

On a break during the last day of trial, a sheriff's officer informed the court that a juror was upset, because she believed one of the audience members had been "making eyes" at her. The court determined that a voir dire of at least that juror, number seven, was required. The judge questioned her and the other jurors at sidebar, inexplicably out of range of sensitive recording equipment. The court denied defendants' motion to declare a mistrial.

We issued a sua sponte limited remand on March 23, 2021, because on appeal both defendants asserted an abuse of the court's discretion in the court's refusal to grant a mistrial, or to excuse a particular juror, on the grounds of improper influence or intimidation after the incident involving the emotionally distraught juror. Both defendants argue that the lack of sufficient record of the jurors' comments deprived them of any opportunity for meaningful review on appeal because the trial judge's summary of the record developed from the jurors' responses was inadequate to permit meaningful appellate review of this issue. Appellate counsel did not serve as trial counsel. We directed the trial

16

judge and trial counsel to develop a comprehensive, reasonably accurate reconstruction of the off-the-record interactions they had with the jurors on April 26, 2018.

On May 7, 2021, the incarcerated defendants filed an emergent application because the trial judge denied their request to be present for the remand proceeding. We denied the application. On May 21, 2021, defendants filed another emergent application, raising an issue with the judge's denial of defendant's motion for a hearing to continue the reconstruction remand. We denied the application as non-emergent because, as we were reviewing defendants' application, we received the trial court's May 21, 2021 decision and order with attachments constituting the statement of proceedings in lieu of a transcript required by our March 23, 2021 remand order. Thus, we considered it unnecessary to address arguments by way of motion because the court's reconstruction was filed as part of the appellate record.

The parties were granted leave to file supplemental briefs to address the remand findings and procedure. On June 6, 2021, defendants submitted supplemental briefs and transcripts of the April 4, 2021, conference and the May 5, 2021, reconstruction hearing. The State submitted a response on June 11, 2021.

At that point, we reversed our previous determination and concluded that in order to meet the requirements of Rule 2:5-3(f), it was necessary for the trial judge to conduct a hearing with both defendants present.

> If a verbatim record made of the proceedings has been lost, destroyed or is otherwise unavailable, the court . . . from which the appeal was taken shall supervise the reconstruction of the record. The reconstruction may be in the form of a statement of proceedings in lieu of a transcript.
>
> [R. 2:5-3(f).]

Here, defendants, who are incarcerated, were denied the opportunity to participate in a hearing. We improvidently denied defendants' emergent application regarding their presence. Thus, we corrected that oversight and again remanded to the trial court for a hearing to reconstruct the record, with defendants present, permitting any modifications or amplifications the trial court wished to add to the decision and order with attachments constituting the statement of proceedings in lieu of a transcript pursuant to Rule 2:5-1 within ten days of the hearing.

We received the trial court's decision and order following the second remand to reconstruct the record on September 9, 2021. Pursuant to our instructions, the trial judge conducted a hearing with both defendants present

18

with their trial counsel. The court submitted supplemental corrections to the transcript and but did not change its prior conclusions.

In the first hearing for reconstruction of the record, the trial court reviewed the submissions of all counsel and listened to the audio recording of the trial on CourtSmart for the date in question. To the extent that counsel agreed to what the transcript stated, the court included those portions of the transcript along with the corrections. Where either counsel disputed what the transcript stated, the disputed portion was identified as being inaccurate. The court found the remaining portions of the record were either inaudible or counsel were not able to agree to what was stated. Where counsel submitted similar but not verbatim interpretations of the record, the trial judge summarized those general statements in the corrections. The court did not otherwise make any independent determination as to what was stated on the record and, pursuant to Rule 2:5–3(f), submitted a statement of proceedings in lieu of a transcript for those portions of the record which were partially audible but not completely discernable. The court found:

> On April 26, 2018, it was brought to this [c]ourt's attention that, during the trial, an audience member had been looking at one of the jurors. As such, this [c]ourt addressed that juror individually at sidebar outside of the presence of the other jurors and on the record with all counsel present and the defendants

19

listening at counsel table via headphones. That juror, juror number seven, indicated that a female audience member was staring at her during the trial. The juror indicated that it made her feel uneasy and she told this to another juror. She became physically upset. When asked if the experience would affect her ability to sit on the jury and render a true verdict in accordance with the evidence in the case, the juror indicated that it would not. She indicated that she could still truly perform her duties as a juror notwithstanding the incident.

Thereafter, each juror was brought to sidebar one at a time in the same manner as juror number seven. Juror number one was asked if, during the course of the trial, she observed anything about any audience members in the courtroom or in the hallway. She indicated that she did not. She did state that she saw juror number seven a little bit distraught and saw her starting to cry. She was concerned for the juror, but her observations of that juror would not have any effect on her ability to render a fair verdict in the case based on the evidence that she heard, nor would it affect her ability to perform her duties as a juror.

Juror number three was asked if, during the trial, he observed anything about any audience members that he would want to bring to the attention of this [c]ourt. He was not aware of anything, nor did he observe any experience with any other juror. He indicated that he did not observe anything that would affect his ability to render a fair verdict in the case.

Juror number four was questioned whether or not she saw anything about any audience members during the trial. She indicated that she did not but, before the trial, there was a female that was trying to talk to other jurors. The juror remembered that the woman started

A-5915-17

talking about jurors disappearing, or something like that. She indicated that the experience would not have any effect on her ability to render a fair verdict in the case based on the evidence.

Juror number five was questioned at sidebar and asked if, during the trial or at any time, she observed anything about any audience members that she thought should be brought to the attention of this [c]ourt. She indicated that she did not. She did indicate that she saw juror number seven crying. She said that juror number seven was upset because she felt that someone was staring at her and she and the other jurors tried to calm her down. When asked if there was anything about what she observed that would affect her ability to render a fair verdict, she indicated that it would not.

Juror number six was questioned at sidebar and was asked if she observed anything about any audience members during the trial that she thought this [c]ourt should know about. She answered that she did not. She also saw juror number seven crying but didn't ask why or what happened. When asked if anything that she heard or saw would have any effect on her ability to render a fair verdict in the case based on the evidence, she indicated that it would not.

Juror number eight was questioned at sidebar. When he was asked if he observed anything during the trial having to do with any interaction with any audience members, he indicated that he did not. He didn't indicate that anything that he saw would affect his ability to render a fair and true verdict based on the evidence.

Juror number nine was questioned at side bar and asked if she observed anything about any audience members or if she had any interaction with any

audience members. She indicated that on the first day of jury selection, she had an interaction with someone outside of the courtroom. She thought that the person was outside in the parking lot on her phone and may have been recording her, but she could not be sure. She indicated that the experience that she had would not have any effect on her ability to render a fair and true verdict in the case based on the evidence.

Juror number ten was questioned at sidebar and asked if there was anything that he observed about any audience members or had any interaction with them that this [c]ourt should be made aware of. He did indicate that he observed people in the audience looking at him. When asked how he felt about them staring at him, he stated that he didn't really care. He indicated that there wasn't anything that he saw or heard or observed during the trial that would have any effect on his ability to reach a fair and true verdict based on the evidence in the case.

Juror number eleven was questioned at sidebar. She was asked if she observed anything about any interaction with any audience members that she thought this [c]ourt should be made aware of. She did indicate that juror number seven said that somebody was whispering about her. She said that that made her feel slightly uncomfortable. She said that there was nothing that she heard or observed during the trial that would affect her ability to reach a fair and true verdict based on the evidence.

Juror number twelve was questioned at sidebar. She was asked if there was anything during the course of the trial that she observed regarding any interaction with any audience members that she would want to bring to this [c]ourt's attention. She said that she did not. She did indicate something about some person

22

making a recording; however, there was nothing that she saw or observed that would affect her ability to render a true and fair verdict based on the evidence.

Juror number thirteen was questioned at sidebar. She was asked if she observed anything or had any interaction with any audience members that she would want this [c]ourt to be made aware of. She indicated that she did not, but one day she was waiting for the elevator and a woman walked up and was saying something on her phone and then the juror just walked away. She indicated that there were two ladies in the audience who did stare at her, but it didn't faze her. She did not observe or hear anything that would affect her ability to render a fair and true verdict based on the evidence.

Juror number fourteen was questioned at sidebar and was asked if during the trial he made any observations or had any interactions with any audience members. He responded that there were none and that there was nothing that he saw or heard during the course of the trial that would affect his ability to render a fair and true verdict based on the evidence.

Initially, both defendants disputed the court's conclusion on appeal, but did not argue that the record was inaccurate. Davis asserted it was insufficient that jurors believed themselves capable of impartiality, because the circumstances permitted no reasonable assurance of that impartiality, necessitating a mistrial. Mays argued that juror number seven's subjective belief in her own ability to remain impartial should not have entered the court's

23

consideration and asserts that the court should have at least excused her from service.

He also contends that the sheriff's officers who reported the incident should have been examined to inform the court's decision, and both defendants add in their pro se briefs that the jurors should have been subjected to further voir dire regarding the other incidents of potential intimidation that they had revealed in their initial questioning. Both defendants argue that the lack of any record of the jurors' comments deprived them of any opportunity for meaningful review on appeal. We agreed with this assertion because the appellate attorneys were not the trial attorneys and were then as similarly disadvantaged as the court, which is why we ordered a reconstructed record.

After the second remand, we entertained supplemental briefs from the parties. Davis and Mays asserted the same arguments previously raised but now argue that the reconstruction is fundamentally flawed because gaps in the transcript could not be corrected. Their argument misconstrues the remedy we provided.

The absence of a verbatim record "raises a question concerning fairness that must be addressed." State v. Casimono, 298 N.J. Super. 22, 26 (App. Div. 1997) (quoting State v. Izaguirre, 272 N.J. Super. 51 (App. Div. 1994)).

24

Accordingly, under Rule 2:5-3(f), "[i]f a verbatim record made of the proceedings has been lost, destroyed or is otherwise unavailable, the court or agency from which the appeal was taken shall supervise the reconstruction of the record." Id. at 25. When such a record is lost, the trial judge, as a matter of due process, must reconstruct the record in a manner that "provides a reasonable assurance of accuracy and completeness." Id. at 26.

Trial courts have some discretion in how they supervise the reconstruction of a record, but that discretion is limited by the requirements of due process. See id. In some cases, the reconstruction procedure has only included the participation of the trial judge and counsel, involving the exchange of trial notes maintained by the court and all counsel. See id. at 26. However, in other cases, trial judges have allowed defendants to participate in reconstruction proceedings. See, e.g., State v. Gaines, 147 N.J. Super. 84, 89 (App. Div. 1975).

In Gaines, the defendants appealed their convictions and sentences of three to five years in state prison for carrying a firearm in a motor vehicle and possessing a silencer. Id. at 87. After their appeal was filed, a transcript of one trial day could not be obtained because the official court reporter's notes were missing. Id. at 88. Accordingly, we remanded the matter to the trial

judge for reconstruction of the record. In addition to the participation of counsel, the judge allowed the defendants an opportunity to contribute their recollection of the testimony in open court. Id. at 88-89. The judge considered the statements of the attorneys and the parties, and his own recollection of the proceedings when recreating the record. Id. at 89.

In Casimono, the trial judge used an inappropriate method because there was no input in the reconstruction of the record from either attorney. 298 N.J. Super. at 25. Further, this court held that, as a matter of due process, "[a]t a minimum . . . the prosecutor and defense counsel must participate, the defendant must have an opportunity to attend the proceeding designed to resolve any differences, and the trial judge must settle the record on notice to all participants." See id. at 26 (emphasis added). The court ultimately remanded the matter for proper reconstruction because it had no reasonable assurance of the accuracy or completeness of the record as required by due process. Ibid.

Rule 2:5-3(f) governs reconstructing the record.[2] The reconstruction may be a statement of proceedings in lieu of a transcript. R. 2:5-3(f). We

_____

[2] See R. 2:5-3(f).

26                                                              A-5915-17

have explained that "it becomes the duty of the trial court as a matter of due process entitlement of the parties to reconstruct the record in a manner that, considering the actual circumstances, provides reasonable assurances of accuracy and completeness." Izaguirre, 272 N.J. Super. at 57. To meet the reasonable assurances of completeness and accuracy required by due process, we remanded this matter to the trial court and ordered that the record be reconstructed with defendants present.

> If no verbatim record was made of the proceedings before the court or agency from which the appeal is taken, the appellant shall, within [fourteen] days of the filing of the notice of appeal, serve on the respondent a statement of the evidence and proceedings prepared from the best available sources, including appellant's recollection. The respondent may, within [fourteen] days after such service, serve upon the appellant any objections or proposed amendments thereto. The appellant shall thereupon forthwith file the statement and any objections or proposed amendments with the court or agency from which the appeal is taken for settlement and within [fourteen] days after the filing of the same the court or agency shall settle the statement of the proceedings and file it with the clerk thereof, who shall promptly provide the parties with a copy. If a verbatim record made of the proceedings has been lost, destroyed or is otherwise unavailable, the court or agency from which the appeal was taken shall supervise the reconstruction of the record. The reconstruction may be in the form of a statement of proceedings in lieu of a transcript.
>
> [Ibid.]

27

Under Rule 2:5-3(f), the process by which a permissible reconstruction of the record is forged is a collaborative effort, which requires the participation of counsel and the trial judge. Further, for the purposes of determining whether a lost record has infringed upon due process, this court has found that there is no per se difference between situations in which only portions of the record need to be reconstructed and where the entire trial transcript has been lost. State v. Bishop, N.J. Super. 335, 347 (App. Div. 2002) (citing Izaguirre, 272 N.J. Super. at 56). In addition, when only portions of a trial record are missing, a duty is placed upon the defendant to show an exercise of due diligence to correct the deficiency in the record and that the defendant was actually prejudiced by the record's deficiency. Bishop, N.J. Super. at 347 (citing State v. Paduani, 307 N.J. Super. 134, 142 (App. Div. 1998)). General allegations of due process violations are not sufficient to support a constitutional violation from an inadequate trial transcript or the record. Moreover, Rule 2:5-3(f) does not require the reconstruction of the transcript as defendants suggest.

Here, the trial judge reconstructed the record in a manner that provides a reasonable assurance of completeness and accuracy to satisfy due process. Gaines, 147 N.J. Super. at 89. Unlike the court in Casimono, the judge

originally and continually included input from counsel. The judge held a second hearing with both defendants and their trial attorneys. All counsel had the opportunity before the hearing to review prior documents and recordings to determine if the record needed additions, amendments, or deletions. At the hearing, the judge gave all parties the opportunity to be heard on the issue of the reconstruction of the record. Thus, the judge concluded that the September 8, 2021, decision and order and supplemental correction to the transcript, along with the prior order, constituted a comprehensive, reasonably accurate reconstruction of the record of the court's sidebar discussions with the jurors and all trial counsel on April 26, 2018.

Furthermore, integral to a criminal defendant's state and federal constitutional right to trial by an impartial jury, State v. R.D., 169 N.J. 551, 557 (2001), and more broadly to a fair trial, is the requirement that the jury decide the case according to the evidence and arguments presented in court rather than based on outside influences. When a juror may have been exposed to extraneous influences or information during a trial, the court must act swiftly to investigate any factors impinging on the juror's impartiality, R.D., 169 N.J. at 557-58, and ascertain whether he or she remains capable of fulfilling his or her duty in an impartial and unbiased manner.

A-5915-17

The court must "consider the gravity of the extraneous information [or influence] in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to [it], and the overall impact of the matter on the fairness of the proceedings," R.D., 169 N.J. at 558, and should rely for that inquiry on its "own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality," State v. Scherzer, 301 N.J. Super. 363, 487 (App. Div. 1997).

In our view, the judge's reconstruction of the record represents an adequate summary of the jurors' responses to permit an appropriate review. We discern no reason to question the judge's recitation of his findings.

The judge did not merely accept the jurors at their word that they could remain impartial but arrived at his conclusion based on his observation of their demeanor and consideration of their responses, including that they had experienced staring from audience members on either side of the aisle, and that this experience sometimes made them feel uncomfortable but not intimidated. As for the requests for further voir dire, defendants do not explain what could have been accomplished by additional inquiry into the other incidents once the jurors had already recounted them. Nor does Mays explain what the sheriff's officers might have offered other than their observation of juror number

30

seven's demeanor and emotional state, which the court and counsel observed first-hand. Hence, the court's decision to deny a mistrial based on this inquiry did not constitute an abuse of discretion, and defendants' arguments to the contrary do not present grounds for reversal.

## II.

Both defendants argue that the court abused its discretion when it admitted the text messages. Mays also asserts error for the admission of the blood stain on his boot, the emergency 911 call, the body camera footage of the crime scene, a detective's testimony identifying the vehicle in surveillance footage as an Infiniti, and a photograph of defendants with the victim. We consider each in turn.

Both defendants challenge the admission of the text messages sent among themselves and Michael pursuant to a series of hearsay exceptions. We consider the issues under an abuse of discretion standard. State v. Scharf, 225 N.J. 547, 569 (2016).

The message sent from the 914 number to Michael stating, "on the road, hour," and the series of messages between the 914 and 702 numbers, were offered variously as: present sense impressions, statements as to state of mind, party admissions, and co-conspirator declarations. The "present sense

31

impression" exception permits admission of any "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(1). The timing of the statement is crucial and must be genuinely contemporaneous to the event—within seconds rather than minutes—to warrant its admission. See State ex rel. J.A., 195 N.J. 324, 339 (2008).

Here, the court found the messages were relevant to establish Mays's familiarity with Michael and defendants' planning of the crimes. The first message, purportedly between Mays and Michael, qualified as a present sense impression, and that the messages comprising the longer exchange between defendants could fit within any of the above exceptions.

On appeal, both defendants challenge admission of the text messages arguing the State did not introduce any direct evidence establishing that they were the ones using the phones on the night of the murders. They emphasize that admission of this evidence was highly prejudicial, and the court should have at least given an appropriate limiting instruction regarding its use. We disagree.

Evidence demonstrated Davis bought the phones and pre-paid cards associated with the numbers involved in the exchange, and that the phone with the 702 number traveled along the same route as the Yukon, which Davis's girlfriend testified was his. Similarly, the phone with the 914 number tracked the same path as the Infiniti, which Murray recalled having seen Mays driving near Michael's home the night of the murder, and which Mays's girlfriend confirmed he was using. As for any limiting instruction conditioning the jury's consideration of the messages on a conclusion that defendants were the declarants, defendants never requested such instruction(s), and the messages were admissible at least as present sense impressions regardless of the identity of the declarants. N.J.R.E. 803(c)(1).

We reject Mays's separate argument that there was no evidence the text to Michael was a present sense impression. The message "on the road, hour" plainly communicates a contemporaneous perception of being on the road, and the arrival estimate of an hour makes no sense unless conveyed immediately. The court was well within its discretion to conclude that it qualified as a present sense impression pursuant to N.J.R.E. 803(c)(1).

Both defendants next argue that the court abused its discretion by rejecting Davis's request to admonish the jury against drawing inferences from

33

other inferences in reaching its verdict. The court instructed the jury with the model charges for circumstantial evidence:

> Now, as instructed at the beginning of this case, evidence may be either direct or circumstantial. Direct evidence means evidence that directly proves a fact without an inference and which in itself if true conclusively establishes that fact.
>
> On the other hand, circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.
>
> Whether or not inferences should be drawn is for you to decide using your own common sense, knowledge, and everyday experience. Ask yourselves if it is probable, logical, reasonable.
>
> Now, it's not necessary that all the facts be proven by direct evidence. They may be proven by direct evidence, circumstantial evidence, or by a combination of direct and circumstantial evidence. Both direct and circumstantial evidence are acceptable as a means of proof.
>
> In many cases, circumstantial evidence may even be more certain, more satisfying, and more persuasive than direct evidence. In any event, both direct and circumstantial evidence should be scrutinized and evaluated carefully.
>
> A verdict of guilty may be based on direct evidence alone, circumstantial evidence alone, or a combination of direct evidence and circumstantial evidence

A-5915-17

> provided of course that it convinces you of a defendant's guilt beyond a reasonable doubt.
>
> The reverse is also true. The defendants may be found not guilty by reason of direct evidence, circumstantial evidence, a combination of the two, or a lack of evidence if it raises in your mind a reasonable doubt as to the defendant's guilt.
>
> If circumstantial . . . evidence gives rise to a reasonable doubt in your minds as to the defendant[]s' guilt then the defendants must be found not guilty.

See Model Jury Charges (Criminal), "Circumstantial Evidence" (rev. Jan. 11, 1993).

Defendants requested the court add the admonition: "[a]lthough you can draw more than one inference from a fact or group of facts, you cannot draw an inference from an inference." The court found no justification for a departure from the model charges regarding circumstantial evidence and that the added language might serve only to confuse the jury as to which inferences were permissible and which were not.

On appeal, Davis asks us to rely on United States v. Arras, 373 F.3d 1071, 1073 (10th Cir. 2004), and reiterates that his possession of the Yukon and purchase of the cell phones could have led the jury to unfairly convict him based on impermissibly stacked inferences. Arras does not support Davis's assertion that the additional language is necessary, but merely reiterates what

A-5915-17

is inherent in our model charge on circumstantial evidence: the sufficiency of inferential evidence requires the jury to assess whether it is reasonable and logical.

Mays adds that other courts have strictly forbidden drawing inferences from other inferences and argues that the jury must have reached its verdict based on a "number" of unspecified inferences impermissibly drawn from evidence related to the vehicle's travel, the substance of the text messages, the unconfirmed blood stain on Mays's boot, and Mays's purported visit to Michael's apartment the day before the murders.

Based on our review, a reasonable juror directed to follow the model jury charge on circumstantial evidence could directly infer from credible testimony that defendant had possession of the Yukon during the week surrounding the crimes and that he drove it on the night at issue. Moreover, we disagree that the other inferences challenged are so tenuous as to rest exclusively on other inferences. Nor have defendants lodged any other challenge to the accuracy or sufficiency of the whole charge. Consequently, we discern no error in the court's rejection of Davis's charge request, and defendants' arguments to the contrary present no grounds for reversal.

 A-5915-17

III.

Both defendants challenge the sufficiency of the evidence in the record to support their convictions—Davis argues that the court erred in denying his motion for acquittal at the conclusion of the State's case, and Mays argues that the verdict was against the weight of the evidence.

On a motion for judgment of acquittal pursuant to Rule 3:18-1, the court must determine:

> [W]hether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt.
>
> [State v. Wilder, 193 N.J. 398, 406 (2008) (quoting State v. Reyes, 50 N.J. 454, 459 (1967)).]

The same standard applies on appeal. State v. Josephs, 174 N.J. 44, 81 (2002).

Addressing Davis's motion for such relief, the court noted from the outset that this was "clearly a circumstantial case," recounting the evidence linking defendants to the crimes, including GPS tracking data, text messages between the cell phones purchased by Davis, and the blood-stained glass fragment found in the Yukon. The court rejected this argument and concluded

that the record, while not overwhelming, sufficed to permit a jury to find guilt beyond a reasonable doubt.

Davis argues on appeal that the State's case was purely circumstantial and required stacking inferences to reach a determination of guilt and consisted of unreliable evidence. In his pro se brief he argues the State never presented any competent evidence establishing that the phones he purchased were the ones used in connection with the crimes, that the GPS and tollbooth evidence never actually tracked the Yukon to his home in Egg Harbor Township, and that his girlfriend's testimony to the effect that he had possession of the vehicle was unreliable, because she did not live with him, was aware that others had used the vehicle, and did not specifically speak with him about whether anyone else had been driving it around the time the crimes were committed. Moreover, he never denied that he knew Michael, but asserts that their relationship should have had no bearing on his guilt.

Proving a conspiracy through circumstantial evidence is not unusual, State v. Samuels, 189 N.J. 236, 246 (2007). Among other things, evidence in the record showed Davis bought the phones engaged in the text exchange, and a glass fragment stained with Frasier's blood was recovered from the Yukon his girlfriend testified was his.

Mays, like Davis, takes issue with the purely circumstantial nature of the case and argues that the Infiniti was not registered to him and asserts that no credible eyewitness saw him driving it the night of the murders. He contends Murray's testimony was unreliable, the stain on his boot was neither confirmed to be blood nor ever subjected to DNA analysis linking it to any of the victims, and no one ever testified to having communicated with Mays at the 914 number used in the text exchange leading up to the murders. He reiterates that the purported blood stain and other crucial pieces of evidence—the detective's testimony regarding the make and model of the vehicle in the surveillance video, the text messages, the 911 call, and body camera footage—had been wrongfully admitted.

But all evidence was appropriately admitted, and, although the purported blood stain found on the instep of his boot had limited probative value, which we address below, other evidence included a blood stain on Michael's basement steps impressed with a footprint. Evidence showed the phone associated with the 914 number was tracked along the same route as the Infiniti that Mays's girlfriend testified he was using, and Murray saw Mays driving an Infiniti near Michael's home that night. Whatever the merits of

39

Mays's challenge to Murray's testimony, it was the jury's prerogative to evaluate her credibility.  State v. Coleman, 46 N.J. 16, 43 (1965).

Based on our review, the record was sufficient to permit a reasonable jury to find defendants guilty beyond a reasonable doubt.

IV.

Mays alone raises other arguments that we address herein.  He contends that the court abused its discretion by admitting evidence of the purported blood stain found on his boot at his arrest two weeks after the murders, arguing its probative value was outweighed by the risk of prejudice.

The State introduced testimony from a serologist and DNA expert that the stain yielded a presumptive positive result for blood on the Kastle-Meyer— or phenolphthalein—test, along with an explanation of the significance and limitation value of that result.  Such tests may not be admitted unless "shown to be generally accepted, within the relevant scientific community, to be reliable."  State v. Chun, 194 N.J. 54, 91 (2008).  Notwithstanding the presumptive positive test result, the expert cautioned that the test could yield a false positive and could not detect whether the substance was even from a human, and that the sample was not sufficient, whether due to deterioration or cleaning, to conduct any further analysis to confirm the presence of blood or

obtain any DNA evidence. Mays did not challenge to the reliability of the test but objected on the ground that the prejudice posed by the presence of an "alleged" blood stain far outweighed its negligible probative value.

Relying on authority dealing with admissibility of blood type test results, the court reasoned that, although the single stain was certainly not conclusive evidence of guilt, particularly given that it could not be linked to any of the victims, the jury was entitled to consider it in the full context of the State's case, including photographs of blood at the crime scene and testimony about blood on the glass fragment found in the Yukon, to evaluate whether defendant was guilty beyond a reasonable doubt. The court allowed the evidence but cautioned that it would be up to the jury to assign that evidence an appropriate weight.

On appeal, Mays argues this evidence had minimal probative value, because the stain was never confirmed to be blood or that it came from any of the three victims and the jury could only speculate as to the identity of the substance or its source, rendering any consequent inference of guilt improper. Mays further faults the court for its reliance on clearly distinguishable case law regarding blood type tests rather than State v. Pittman, 419 N.J. Super. 584, 591-95 (App. Div. 2011), which dealt specifically with the Kastle-Meyer test

and rejected its admission in part based on the lack of any expert evidence in the record as to its reliability.  He now challenges for the first time the State's failure to establish the scientific reliability of the test and the court's failure to give an appropriate limiting instruction as to the jury's consideration of this evidence.

We agree that the presumptive positive result had limited probative value.  The sample was not conducive to further analysis, either to confirm that it was blood or even human, much less that it belonged to any of the victims.  But the experts who testified to the test results were candid about those limitations, mitigating any potential prejudice that could have been presented by admission.

To the extent the admission of this evidence was error, we consider it harmless and in the context of the entire trial not "'clearly capable of producing an unjust result.'"  State v. J.R., 227 N.J. 393, 417 (2017) (quoting R. 2:10-2).

V.

Mays next contends the court abused its discretion in admitting evidence of Riley's emergency 911 call and body camera footage from the crime scene, in which Riley appeared.  Davis's counsel, not Mays's, objected to admission of the 911 call at trial, as it served no purpose other than to evoke sympathy

42

from the jury. The court confirmed with counsel that there was no dispute as to the recording's authenticity and otherwise overruled the objection without elaboration. Riley became emotional during the playback of the recording, requiring a brief pause in the proceedings, but ultimately explained her calm demeanor on the recording as the result of positive thinking, hoping that nothing had happened to her father.

Later, when the State sought to introduce body camera footage depicting the crime scene as it was first found, the defense requested that the footage be redacted to eliminate Riley's emotional reaction, arguing that the brief portion of the video was highly prejudicial and devoid of probative value.

Based on its review of the video recording, the court found it was clearly relevant, showing the condition of the crime scene upon the arrival of first responders. As for the risk of prejudice, the court rejected the argument that the reaction captured on video would have any greater effect on the jury than the emotional reaction it had already witnessed when Riley testified. The court was therefore within its discretion to admit both the 911 recording and crime scene footage over objections that their prejudice outweighed their probative value, and Mays's arguments to the contrary offer no grounds for reversal.

A-5915-17

Mays next challenges the admission of a detective's testimony describing a vehicle, purportedly Mays's Infiniti, shown in video footage, asserting that this testimony was akin to expert testimony and should not have been given by a lay witness. We reject this argument.

The detective narrated black-and-white surveillance footage from Van Ness Court and identified the make and model of the vehicle shown based on his experience and training as a police officer. Mays's counsel objected on grounds that this testimony would invade the ultimate province of the jury to find whether the vehicle in the footage matched the one Mays was allegedly driving, that the detective's opinion as to this poor-quality footage was tainted by his investigation, and, in any event, that he was not qualified as an expert.

The same argument was squarely addressed in State v. LaBrutto, 114 N.J. 187, 198-202 (1989), where the Supreme Court concluded that an officer could testify based on his observations and in light of his training and experience, when the matter did not "involve such complicated technical and scientific evidence that only a qualified reconstruction expert could rationally form an opinion about the point of impact," and that the officer adequately apprised the jury of the basis for his opinion.

Mays next challenges admission of a photograph depicting defendants and Michael, arguing it was never properly authenticated. A trial court exercises discretion in admission of such evidence, and its ultimate decision will be reviewed on appeal only for an abuse of that discretion. State v. Hockett, 443 N.J. Super. 605, 615 (App. Div. 2016).

The photograph at issue here was a digital image downloaded by McKenney from a friend's Facebook page and depicted nine people in a nightclub. McKenney was not present for the photograph and did not know who the photographer was or when it was taken, but he believed it was taken inside the Onyx nightclub in Philadelphia, based on the caption to the image and his familiarity with the appearance of that club's interior. He identified both defendants and Michael among the group of people shown in the picture.

The court found the testimony sufficient to authenticate the photograph. McKenney knew the individuals pictured and that the image accurately reflected them. His uncertainty as to the scene, timing, or the photographer remained pertinent to his credibility, but not to the photograph's admissibility. Moreover, the photograph was plainly relevant to the State's case that this was not a stranger-on-stranger crime, as it tended to show that the defendants and

45

the victim knew each other.  Based on our review, the admission of the photograph posed no harm that would justify reversal.

VI.

We now address Davis's arguments.  He contends the court should have granted his motion for a mistrial and severance after the State, followed by Mays's counsel, impermissibly elicited testimony that Davis asserts showed Mays was participating in a drug distribution enterprise with Michael and Frasier.

A mistrial is an extreme remedy that "imposes enormous costs on our judicial system."  State v. Jenkins, 182 N.J. 112, 124 (2004).  Consequently, it should be granted only with the "greatest caution," State v. Witte, 13 N.J. 598, 611 (1953), and only where required "to prevent an obvious failure of justice," State v. Harvey, 151 N.J. 117, 205 (1997).

A joint trial of defendants alleged to have participated in the same criminal act or transaction is preferable, because it serves the purpose of "judicial economy, avoids inconsistent verdicts, and allows for a 'more accurate assessment of relative culpability.'"  State v. Weaver, 219 N.J. 131, 157 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).  Although all joint trials present the inherent "danger of guilt by association . . . , this peril

can generally be defeated by forceful instructions to the jury to consider each defendant separately." State v. Scioscia, 200 N.J. Super. 28, 43 (App. Div. 1985) (citation omitted).

Severance is sometimes warranted, and a court should "'balance the potential prejudice to defendant's due process rights against the State's interest in judicial efficiency,'" and may grant that relief where, as Davis argues, the "defenses are antagonistic and mutually exclusive or irreconcilable," rendering separate trials necessary. Brown, 118 N.J. at 605 (quoting State v. Coleman, 46 N.J. 16, 24 (1965)). We review such a determination under an abuse of discretion standard. State v. Sanchez, 143 N.J. 273, 283 (1996). We find none here.

At issue is proffered testimony from McKenney that Mays was involved in a drug distribution scheme with Michael. Under a theory that the crime was committed by someone familiar with Michael's drug operation, this testimony highlighted issues of motive and opportunity. Defendants objected. Mays contended this was unduly prejudicial, and Davis asserted that admission of the evidence, which implicated only Mays, would require severance. The court agreed and denied the State's motion to introduce this evidence.

At trial, when McKenney began testifying about how he would place orders for heroin, Davis's counsel objected, citing the earlier ruling, asserting the State was attempting to introduce the forbidden evidence of Mays's drug dealing through innuendo and that this course of action would constitute grounds for a mistrial or at least a curative instruction that the evidence was admissible only against Mays. After some discussion, the court narrowly permitted McKenney to testify that Mays was present for a conversation between McKenney and Michael regarding drugs but could not implicate Mays himself in any criminality in violation of its prior ruling. The court denied the motion for a mistrial and declined to issue any instruction until it heard McKenney's testimony.

McKenney then testified about a conversation he had with Michael about drugs while Mays was present during a trip to Myrtle Beach, South Carolina. On cross-examination by Mays's counsel, McKenney further confirmed that Mays knew where Frasier stashed drugs. Davis's counsel renewed his objection and prior motion in all respects, but the court denied any immediate relief, noting that if, after the close of the evidence, counsel believed a limiting instruction remained warranted, it would entertain any such instruction at the

48

charge conference. Davis's counsel renewed the request again the following day to the same result.

Davis argues the clear import of McKenney's testimony was that Mays was complicit in Michael's drug business; yet, the record showed no evidence connecting Davis to that enterprise, presenting a conflict. Davis had relied on earlier rulings that defendants' involvement in drug dealing would be unduly prejudicial and therefore inadmissible in declining to move for severance. Once that ruling was violated, the need for severance manifested and required a mistrial or, at the very least, a limiting instruction that the evidence of drug dealing was admissible only against Mays and the court's failure to take either remedial measure requires reversal. We disagree.

Based on our review, McKenney's testimony did not violate the earlier ruling, which specifically excluded evidence purporting to establish defendants' drug dealing pursuant to N.J.R.E. 404(b). Although McKenney confirmed Mays's awareness that Michael was a drug dealer and his knowledge of the location of Frasier's stash, McKenney did not implicate either defendant as a participant in Michael's business or as otherwise engaged in drug distribution, which would present the undue prejudice the ruling was meant to address.

49

Nor did the fact that this evidence pertained only to Mays reflect such prejudice to Davis or create such a conflict as to require severance. Brown, 118 N.J. at 605. Defendants were charged with a conspiracy in which each served different roles, to which overlapping, but not completely correspondent sets of evidence were relevant. We have said "a claim of prejudice grounded upon the prospect that some evidence will be admissible only as to one defendant [or another] does not require severance as of right." State v. Hall, 55 N.J. Super. 441, 449 (App. Div. 1959). Moreover, although the court declined to issue an immediate limiting instruction, it later charged the jury that it was to consider the evidence against each defendant separately, Scioscia, 200 N.J. Super. at 43, and the jury is presumed to have followed that instruction, State v. Burns, 192 N.J. 312, 335 (2007).

Davis also argues that certain of the prosecutor's remarks during summation were so egregiously prejudicial as to deprive him of a fair trial.

"'[N]ot every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." State v. Jackson, 211 N.J. 394, 408-09 (2012) (quoting State v. Williams, 113 N.J. 393, 452 (1988)). In evaluating the remarks, we consider "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn

50

promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Smith, 167 N.J. at 182.

Davis specifically takes issue with the following comments. First, he believes the prosecutor disparaged both defense attorneys by suggesting at the outset of the prosecutor's summation that their closing arguments had been meant to discourage the jurors from reaching a verdict based on a fair evaluation of the evidence:

> They're trying to scare you, so that you can't do your
> duty to make a decision in this case, and that decision
> is supposed to be on the facts and the evidence.

Davis further faults the prosecutor for openly surmising about accomplice liability, without adequate support, that all the perpetrators wore gloves:

> But what I want you to think about is as the killers are
> putting these gloves on, they're not — look, they don't
> — they don't just slip right on. As the killers are
> putting latex gloves on, going to a house what's going
> through their heads? And it's one and only one thing,
> everyone in the house is going to die, and there's not
> going to be any witnesses.
>
> So, whether you are actually one of the people that did
> it, that shot or you're the inside man who let in the
> other two guys or you[']r[e] holding Lance down as
> someone else is stabbing him, everyone is all in.

Lastly, Davis complains that the prosecutor closed this line of argument by explicitly stating a belief in defendants' guilt:

> There's no oh, I kind of sort of participated in this. . . . This was planned for weeks, the phones were bought weeks prior. Lavelle started going to Lance's house weeks prior, and start[ed] calling Mike weeks prior to set him up. Everyone's in. Jimmy, Lavelle and the unidentified person are all guilty of murder as to each of those victims.

Davis's counsel challenged all three remarks at the charge conference. He urged the judge to instruct the jury to disregard the prosecutor's expressed belief in defendant's guilt and accusation that defense counsels were trying to scare them. As for the remark about the gloves and its implication for the lack of fingerprint evidence, counsel believed the evidence—a single piece of a glove stuck to duct tape—did not warrant an inference that more than one perpetrator had worn them, and asked the judge to remind jurors, with specific reference to that statement, that their own recollection of the evidence should control.

The judge agreed that the prosecutor's expression of a belief in Davis's guilt required a curative instruction. But he believed the prosecutor's argument about the gloves was a fair comment on the evidence and was therefore adequately addressed by the standard charge that the jury's recollection of the

52

evidence should control.  As for the fleeting remark about scaring the jury, the judge viewed it, and considered in context, as a fair response to defense counsel's own highly emotional summation.

Davis acknowledges on appeal that the court gave the requested curative instruction as to the expression of guilt, yet suggests he was still prejudiced by it.  He further asserts, with little elaboration, that the prosecutor's remark purportedly disparaging defense counsel was improper but makes no specific argument as to either the propriety of or prejudice from the comment about the gloves, except by reference to his objection below.

Davis was granted the curative instruction he sought, and there is no reason to presume that the jury failed to follow its instructions to disregard the challenged comment.  State v. Winter, 96 N.J. 640, 649 (1984).  The court was correct, moreover, that the remark about the gloves was a fair comment on the evidence.  Given that a piece of a glove was undisputedly found and that fingerprints were not, a reasonable juror could infer that more than one perpetrator wore the gloves.

The prosecutor's comment about defense counsel arguably suggested that the defense intended to discourage the jury from reaching a verdict based on a fair evaluation of the evidence.  The comment was fleeting, made in the course

of an argument otherwise focused on the evidence in the record, and directly responsive to exceedingly dramatic appeals made by the defense as to the weight of the jury's decision. We discern no reasonable likelihood it substantially prejudiced Davis's right to have the jury undertake a fair evaluation of his defense.

Davis next contends that the court abused its discretion in failing to declare a hung jury. We disagree.

When the jury, as here, declares an impasse, a trial court should ordinarily "inquire . . . whether further deliberation will likely result in a verdict." State v. Valenzuela, 136 N.J. 458, 469 (1994). The court should declare a mistrial only if, considering the "length and complexity of trial and the quality and duration of the jury's deliberations," State v. Czachor, 82 N.J. 392, 407 (1980), it concludes that the "difference of opinion between members of the jury is clearly intractable," Valenzuela, 136 N.J. at 469. Otherwise, the court may instruct that the jury continue its deliberations. State v. Ross, 218 N.J. 130, 144-45 (2014).

The jury submitted a note toward the end of its second day of deliberations, informing the court that it could not reach a unanimous verdict. The court instructed:

> I received your note which I've marked as court exhibit [eighteen] which reads, "We cannot reach a verdict unanimously."
>
> This has been a very long trial. It lasted several weeks. There's a significant amount of evidence for you to consider. You started your deliberations yesterday morning. There was a period of time yesterday where some play back or read back was requested. And there was time spent preparing that and then playing it back for you.
>
> Today, we did not start until this afternoon after about 1:00 o'clock and it's not 4:00 o'clock. So, you have not yet been deliberating long enough for me to dismiss you from this case.
>
> So, what I am going to do is I understand it's been a long time and you might be tired. So, I will dismiss you for today. But, I am going to bring you back Monday morning at 9:30 to continue your deliberations.
>
> So, you have the weekend to rest up and be ready Monday morning to continue.

Just before deliberations resumed the following week, Davis's counsel objected to the instruction, arguing that its language unfairly undercut the defense's position that there was a lack of evidence in the record connecting defendants to the crimes. Counsel initially proposed that the court give either a modified Allen[3] charge or an instruction that the jury resume deliberations

---

[3] Allen v. United States, 164 U.S. 492 (1896).

"in order . . . to determine whether [it was] or [was] not able to reach unanimous verdicts," but the court rejected the first as premature and both as irrelevant to counsel's narrow objection.

Counsel then requested that the court at least read the jury language from the model charge as to the quality of evidence, and the court complied, instructing the jury:

> As I told you on Friday given the length of the trial I've brought you back here today to continue your deliberations.
>
> I made reference to a number of exhibits that were in evidence that you have with you in the courtroom. But it's the quality of the evidence and [not] simply the number of witnesses or exhibits that control.
>
> So . . . I'm going to ask you to return into the jury deliberation room, continue your deliberations, and we will await further note from you.

On appeal, Davis argues the court erred by informing the jury that it had not yet been deliberating long enough to permit dismissal without at least inquiring whether further deliberations would likely be fruitful and that the court effectively communicated through the above instructions that a hung jury would not be acceptable, thereby compelling further deliberation, coercing the resulting agreement, and depriving him of a fair trial. We disagree.

56

Both instructions advised that the jury had not yet deliberated long enough. There was no implication that a hung jury was unacceptable if sufficient further deliberations failed to break the impasse. Although a court, to be sure, should ordinarily make such inquiry, it need not always do so, particularly where, as here, deliberations have been relatively brief. State v. Figueroa, 190 N.J. 219, 239-40 (2007).

## VII.

Lastly, both defendants contend that their sentences were excessive. A trial court exercises considerable discretion in sentencing. State v. Dalziel, 182 N.J. 494, 500 (2005). Its decision will not be disturbed so long as it follows the applicable statutory guidelines, identifies and weighs all applicable aggravating and mitigating factors, and finds the support of sufficient credible evidence in the record. State v. Natale, 184 N.J. 458, 489 (2005). Otherwise, a sentence will be reversed only if it "shocks the judicial conscience." State v. O'Donnell, 117 N.J. 210, 215-16 (1989).

With respect to Davis, the court noted he had two indictable convictions: one in December 2003 for second-degree conspiracy to commit aggravated assault, and the other in September 2009 for third-degree aggravated assault. It found the first aggravating factor, the nature and circumstances of the

offense, N.J.S.A. 2C:44-1(a)(1), because, apart from the murders, Frasier had been bound and sustained multiple wounds which suggested he had been tortured prior to being fatally shot. It found the third aggravating factor, the risk of reoffense, N.J.S.A. 2C:44-1(a)(3), noting that his prior convictions had not served as a deterrent, and concluded his criminal history further justified application of aggravating factors six and nine, the extent of the offender's criminal record and need for deterrence, N.J.S.A. 2C:44-1(a)(6), and (9), respectively. The court found no mitigating factors.

The court sentenced Davis to a term of forty-six years on each of the murder counts, merged the conspiracy count with all three of them, and merged the felony murder count with the first one, for Michael's murder. It then imposed sentences of fifteen years for the robbery, eight years each for unlawful possession and burglary, and four years for the criminal restraint count. The count for possession of a weapon for an unlawful purpose merged into the murder and robbery counts.

Although the court acknowledged that the murders had occurred within the same apartment and in close sequence, they occurred in different places within that apartment at different times and, in the end, were "separate acts of violence . . . caused by distinct types of conduct." The court reasoned the

58

objective of robbing and killing Michael and Frazier was independent of killing Kenilson, who happened to be there, and that Michael and Kenilson were found murdered in the upstairs bedroom while Frazier had been killed separately in the basement. Weighing these factors, the court concluded that Davis's convictions on the three murder counts should run consecutively to ensure that there be "no free crimes," but determined that his sentences on the rest of his convictions should run concurrently to one or the other murder counts, yielding an aggregate sentence of 138 years.

With respect to Mays, the court noted he had twenty-two prior arrests and eight indictable convictions between June 2000 and August 2009, most for possession or distribution of drugs and one for unlawful possession of a handgun, and found the same balance of aggravating and mitigating factors for the same reasons recounted above. The court sentenced Mays to fifty-one years on each count of murder—twenty years for the robbery, ten years each for unlawful possession and burglary, and five years for the criminal restraint count—and merged the balance of his offenses in the same manner as it had Davis's. The court reached the same conclusion as to consecutive sentencing with the same justification, yielding an aggregate sentence of 153 years.

A-5915-17

Both defendants challenge the imposition of consecutive sentences for the murder charges. They acknowledge there were three victims, but argue the murders were committed close in time, in the same location, and with only a single criminal objective—the robbery of Michael for drugs or money. Mays stresses that the murders likely occurred within minutes of one another, the entire series of events transpired in a single apartment, and, in any event, that he maintains his innocence for all these offenses. Davis argues the court failed to consider the balance of the Yarbough[4] standard beyond the admonition that there should be "no free crimes," and in particular, the guidance that there should be an overall limit on the cumulation of consecutive sentences.

The fact that there were multiple victims ordinarily warrants the imposition of consecutive sentences, Carey, 168 N.J. at 428. Here, the court offered a broader rationale, explaining, based on sufficient credible evidence in the record, that these murders were not a unified criminal transaction, but instead varied in time, place, and objective. However, in light of the Supreme Court's recent advisement that the court must provide an explicit statement, explaining the overall fairness of a sentence imposed for multiple offenses in a single proceeding or in multiple sentencing proceedings, as essential to a

---

[4] State v. Yarbough, 100 N.J. 627 (1985).

proper <u>Yarbough</u> sentencing assessment we remand for resentencing consistent with <u>State v. Torres</u>, 246 N.J. 246 (2021).

Both defendants contend their aggregate sentences were nonetheless manifestly excessive. Davis challenges the notion that the first aggravating factor was applicable, contending it double-counted the death of the victims, an element of the murders. Mays does not quarrel with the court's analysis in that respect but asserts without any elaboration that his fifty-one-year sentences were nonetheless excessive.

The court gave both defendants intermediate sentences within the appropriate statutory range despite a clear preponderance of aggravating factors, the findings of all of which were unimpeachable. Double-counting an element of the murders to find the first factor would have been inappropriate, <u>State v. Pineda</u>, 119 N.J. 621, 627 (1990), but the court's finding explicitly relied only on Frasier's torture, not on any element of the murders.

Defendants' other arguments are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed and remanded for resentencing consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

61                                                                A-5915-17